Page 1

1      IN THE UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF ILLINOIS
2                EASTERN DIVISION

3   JOKIM PITTS,                    )
                                    )
4               Plaintiff,          )
                                    )
5        -vs-                       )    No. 2019 C 7573
                                    )
6   CITY OF CHICAGO DETECTIVE,      )
    H. BARSCH, UNKNOWN AND          )
7   UNNAMED CITY OF CHICAGO         )
    POLICE OFFICERS, and THE CITY   )
8   OF CHICAGO,                     )
                                    )
9               Defendants.         )

10

11          The deposition of HENRY BARSCH called by the

12   Plaintiff for examination, taken pursuant to notice

13   and pursuant to the Federal Rules of Civil Procedure

14   for the United States District Courts pertaining to

15   the taking of depositions, taken before Lisa M. Walas,

16   Certified Shorthand Reporter, at 300 West Adams

17   Street, Suite 330, Chicago, Illinois, commencing at

18   1:17 p.m. on the 22nd day of July, A.D., 2020.

19

20

21

22

23

24



Page 2

```
1   APPEARANCES:
2        EDWARD FOX & ASSOCIATES
         MR. ED FOX
3        MS. JACLYN N. DIAZ
         300 West Adams Street
4        Suite 330
         Chicago, Illinois  60606
5        Phone:  (312) 853-3489
         E-mail:  efox@efoxlaw.com
6                 jdiaz@efoxlaw.com
7            On behalf of the Plaintiff;
8   CITY OF CHICAGO
         FEDERAL CIVIL RIGHTS LITIGATION
9        MS. EMILY E. DORY
         MR. NATHAN SHINE
10       30 North LaSalle Street
         Room 900
11       Chicago, Illinois 60602
         Phone: (312) 742-6423
12       E-mail: emily.dory@cityofchicago.org
                 nathan.shine@cityofchicago.org
13
             On behalf of the Defendant Detective H.
14           Barsch;
15  CITY OF CHICAGO
         FEDERAL CIVIL RIGHTS LITIGATION
16       MS. ANDREA CAMPBELL (via videoconference)
         MS. IRIS CHAVIRA (via videoconference)
17       30 North LaSalle Street
         Room 900
18       Chicago, Illinois 60602
         Phone: (312) 744-8362
19       E-mail: andrea.campbell@cityofchicago.org
                 iris.chavira@cityofchicago.org
20
             On behalf of the Defendants Unknown and
21           Unnamed City of Chicago Police Officers and
             The City of Chicago.
22
23                    *  *  *  *  *
24
```

Page 3

```
1               I  N  D  E  X
2
    WITNESS                              PAGE
3
    HENRY BARSCH
4
        Direct Examination by Mr. Fox .........  4
5
        Cross-Examination by Mr. Shine ........ 73
6
        Redirect Examination by Mr. Fox ....... 83
7
8
9               E  X  H  I  B  I  T  S
10  BARSCH EXHIBIT                        PAGE
11      Exhibit 1 (Original Case Incident ..... 43
            Report)
12      Exhibit 2 (Investigative Alert) ....... 58
13      Exhibit 3 (Field Investigation ........ 60
            Suspended Report)
14
        Exhibit 4 (Interrogatories) .......... 68
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
1                (Witness sworn.)
2   WHEREUPON:
3                   HENRY BARSCH,
4   called as a witness herein, having been first duly
5   sworn, was examined and testified as follows:
6                  DIRECT EXAMINATION
7   BY MR. FOX:
8        Q.   Sir, could you state your name and spell
9   your name for the record?
10       A.   It's Henry Barsch, H E N R Y, last name
11  Barsch, B A R S C H.
12       Q.   All right.
13       MR. FOX:  For the record, it's the deposition of
14  the -- It's Detective Barsch, correct?
15       THE WITNESS:  Correct.
16       MR. FOX:  This is the deposition of
17  Detective Barsch taken pursuant to notice and pursuant
18  to all the applicable rules of Civil Procedure and
19  applicable local rules.  It's also being taken
20  remotely and some attorneys are attending via Zoom and
21  others are here and the reporter will take that down.
22  BY MR. FOX:
23       Q.   Have you ever had your deposition taken
24  before?
```

Page 5

```
1        A.   Yes.
2        Q.   All right.  When was the last time?
3        A.   It was over a couple years ago.  I can't
4   remember.
5        Q.   All right.  Well, the proceedings today
6   will likely be similar except that we're all wearing
7   masks.  I'm going to ask you a series of questions,
8   just make sure before you answer you've understood and
9   you've heard me; and if not, I will repeat or rephrase
10  it.  When I ask questions, try to wait for me to be
11  done before you answer because if we talk over one
12  another, that will make the record difficult and
13  likewise I'll try to wait for you to be done with your
14  answer before I ask the next question.  When you
15  answer, please do it verbally.  Uh-huhs and uh-uhs
16  don't work well with the reporter and nods of the head
17  don't well, so we need to have verbal answers.  If you
18  need to take a break for any reason, let us know and
19  we can do that as long as there's no question pending.
20  And the court reporter just put you under oath which
21  has the same force and effect as if you were
22  testifying in a court of law and you're under
23  obligation to tell the truth.  Do you understand all
24  of what I just said?
```



Page 6

1    A.    Yes.
2    Q.    In preparation for this deposition today,
3  did you review anything?
4    A.    Paperwork-wise?
5    Q.    Correct.
6    A.    No.
7    Q.    Did you talk with anybody about this
8  deposition outside the presence of your attorneys?
9    A.    No.
10   Q.    Have you ever read any of the police
11 reports that are in connection with the arrest of
12 Pitts?
13   A.    No.
14   Q.    Have you ever seen any video there in
15 connection with this incident?
16   A.    Yes.
17   Q.    And what video is that?
18   A.    Neighbors' video.
19   Q.    Did you see it with your neighbors or with
20 other police officers or both?
21   A.    Off of just recollection, I believe it was
22 just the police officers.
23   Q.    And which neighbors' video did you look at?
24   A.    Neighbors of north and east on my block.

Page 7

1    Q.    North and east of your block you said?
2    A.    (Nodding.)
3    Q.    That's yes?
4    A.    Correct.
5    Q.    And what was their name?
6    A.    I do not recall.
7    Q.    Did you know who they were from the
8  neighborhood?
9    A.    Can you rephrase that question?
10   Q.    Sure.  Did you know who those neighbors
11 were before you looked at the video?
12   A.    Know them how?
13   Q.    Know them either socially or just by seeing
14 them on the street or in any other way.
15   A.    I seen their faces, I knew they were
16 neighbors.
17   Q.    Had you ever socialized with them?
18   A.    You mean socialize, talk to, hello
19 greetings?
20   Q.    Yes.
21   A.    Yes.
22   Q.    Had they ever been to your house to dinner
23 or vice versa?
24   A.    No.

Page 8

1    Q.    And you don't remember their names?
2    A.    I do not.
3    Q.    Now, just by way of background, you started
4  with the Chicago Police Department in 1996?
5    A.    Yes.
6    Q.    And did you work for any other police
7  agencies before that?
8    A.    No.
9    Q.    What kind of work did you do before them?
10   A.    My employment?
11   Q.    Yes.
12   A.    I worked at the Board of Trade, for
13 St. Xavier University, a couple other places in
14 between.
15   Q.    Okay.  And then after you joined the police
16 department, where was the first district that you were
17 assigned to?
18   A.    I was assigned to the 21st District.
19   Q.    As a patrol officer?
20   A.    That's correct.
21   Q.    How long were you there for?
22   A.    I was assigned there for nine years,
23 approximately.
24   Q.    Where did you go from there?

Page 9

1    A.    I was promoted to detective.
2    Q.    So you were promoted to detective in around
3  2005?  Does that sound right?
4    A.    2006.
5    Q.    And when you were promoted to detective,
6  where did you work, what district or what area?
7    A.    The area was called Area 2 at the time.
8    Q.    And how long did you remain there for in
9  that area?
10   A.    I've been there ever since 2006.
11   Q.    Okay.  What is it called now?
12   A.    It was called Area South for a while and
13 now it's back to Area 2.
14   Q.    And is the -- the station where that's
15 located, is that 111th Street?
16   A.    The area is located at 727 East
17 111th Street.
18   Q.    And have you had any CRs filed against you
19 that were initiated by citizens?
20   A.    Off the top of my head?
21   Q.    Yes.
22   A.    I believe so, yes.
23   Q.    Do you know how many?
24   A.    No.



Page 10

1    Q.    Have any that were filed by citizens ever
2    been sustained against you?
3    A.    None that I know of.
4    Q.    And have you ever been named a defendant in
5    any civil case arising out of your work as a police
6    officer?
7    A.    I believe so.
8    Q.    How many times?
9    A.    I'm not sure.
10   Q.    Do you know what happened to those cases?
11   In other words, did any of them go to trial?
12   A.    I don't know.
13   Q.    Did you ever testify in any civil court in
14   connection with any case in which you were named a
15   defendant?
16   A.    I don't believe so.
17   Q.    Okay.  I want to turn to an incident you
18   had with Jokim Pitts back in June of 2004.  Do you
19   recall that?
20   A.    Yes.
21   Q.    And in that incident in which you had
22   contact with Pitts, you were off duty; is that right?
23   A.    I was heading in to work.
24   Q.    And while you were heading in to work, you

Page 11

1    made some observations on the street or is that how it
2    led to your involvement?
3    MR. SHINE:  I'll object to form.
4    BY THE WITNESS:
5    A.    I made some observations, yes.
6    Q.    What observations did you make?
7    A.    I saw the subject pointing a gun at another
8    subject's head while he was pulling on a purse.
9    Q.    And how far away were you from those people
10   when you made your observations, roughly?
11   A.    I have no idea.
12   Q.    Would you say it was more or less than
13   10 feet?
14   A.    More than 10 feet.
15   Q.    Was it daylight out?
16   A.    No.
17   Q.    What time was it, roughly?
18   A.    I don't recall the specific time.
19   Q.    And without getting into a lot of detail in
20   connection with that incident, you wound up shooting
21   the offender; is that correct?
22   A.    Correct.
23   Q.    And how many times did you shoot him?
24   A.    I believe five times.

Page 12

1    Q.    And in that instance you said he had a gun,
2    correct?
3    A.    Correct.
4    Q.    And did he point the gun at you?
5    A.    Yes.
6    Q.    In that incident, did you wind up being the
7    person -- being the officer who handcuffed -- And for
8    the record, that was Pitts that you had this incident
9    with; is that correct?
10   A.    That's correct.
11   Q.    Okay.  Were you the one -- Were you the
12   officer who wound up handcuffing Pitts in that
13   instance?
14   A.    No.
15   Q.    Other officers came on the scene and
16   assisted?
17   A.    Correct.
18   Q.    Did you assist at all with physically
19   taking Pitts into custody in that incident?
20   A.    No.
21   Q.    Did you ever get closer to him -- closer
22   than 10 feet to him during that incident?
23   A.    What time of the incident?
24   Q.    At any time.

Page 13

1    A.    I believe that when he was still armed, I
2    might have been close to 10 feet or closer after
3    shots -- after I fired shots.  I don't think I came
4    any closer than the original amount of space that he
5    came up on me.
6    Q.    And -- I'm sorry -- I missed it.  So that
7    was -- you were closer than 10 feet to him at some
8    point or no?
9    A.    Possibly at the beginning, yes.
10   Q.    And eventually in that instance, an
11   ambulance came and took Mr. Pitts; is that correct?
12   A.    Correct.
13   Q.    Now, after -- did you -- By the way, did
14   you accompany the ambulance or anybody to the hospital
15   where he was taken to?
16   A.    No.
17   Q.    Okay.  After Pitts was taken away from the
18   scene in the ambulance, did you see him again that
19   day?
20   A.    No.
21   Q.    Did you attend any of the subsequent court
22   appearances that Pitts had in connection with that
23   case?
24   A.    Yes.



Page 14

1    Q.    And was there a trial in that case?
2    A.    Yes.
3    Q.    Did you testify at that trial?
4    A.    Yes.
5    Q.    How many times did you attend court in that
6  case?
7    A.    I don't know.
8    Q.    Was it more than once?
9    A.    Yes.
10   Q.    At any time -- Withdraw that.
11         How many times did you see Pitts between --
12  after the incident where he was arrested and up until
13  the time he was convicted on that case?  How many
14  times did you see him?
15   A.    I don't know.
16   Q.    At any time that you observed -- that you
17  were able to observe Pitts, did he say anything to
18  you?
19   A.    I don't recall.
20   Q.    At any time during the time period after --
21  just after the incident and up through the end of his
22  court case -- let me change that to be up until the
23  end of his trial -- By the way, were you there for
24  when the verdict was rendered in that case?

Page 15

1    A.    No.
2    Q.    During the course of time until -- until
3  Pitts was convicted in that case, did he ever threaten
4  you in any fashion?
5    A.    During the court proceedings?
6    Q.    Yeah, during -- not actually at the court
7  proceedings, but I'm including that, but at any time
8  during that time period did he threaten you?
9    A.    Which time period?
10   Q.    From the time he was arrested in 2004 to
11  the end of his trial for that robbery.
12   A.    I don't recall.
13   Q.    If he had threatened you, would you have
14  made a note of it or reported it to somebody?
15   A.    I would have had to, yes.
16   Q.    Do you recall if you made any report of him
17  threatening you during that same time period?
18   A.    The same time period -- same question?
19   Q.    Correct.
20   A.    I don't recall.
21   Q.    And then following that up until -- up
22  until the date of the incident we're here about which
23  is March 13, 2019, up until that day, did Pitts ever
24  threaten you?

Page 16

1    A.    No.
2    Q.    And then did he ever communicate with you,
3  to your knowledge, at all after his arrest and up
4  until March 12th of 2019 which is the day before the
5  incident in this case?
6    A.    Not to my knowledge.
7    Q.    When you went to court and testified in the
8  Pitts robbery case, you saw Jokim Pitts at that time;
9  is that right?
10   A.    Yes.
11   Q.    Okay.  After you were done with your
12  testimony in that case, did you ever see him again up
13  until March -- up until and including March 12th of
14  2019?
15   A.    Up and to the incident that occurred on my
16  porch?
17   Q.    Yes, sir.
18   A.    In between or on that day?
19   Q.    No, before that day.
20   A.    Before that day?
21   Q.    Let me just get the question out fully
22  then.  The incident as I understand it that we're here
23  about happened on March 13th.  So my question is, up
24  until March 12th, the day before, to your knowledge,

Page 17

1  had you ever seen him?
2    A.    Between the court and that date?
3    Q.    Correct.
4    A.    No, not to my knowledge I didn't.
5    Q.    Okay.  Now, after Pitts was sentenced on
6  the robbery case that you testified at, did you keep
7  track of where he was being housed?
8    A.    Individually?
9    Q.    Correct.
10   A.    No.
11   Q.    Did you -- Up until the day before this
12  incident, again up until including March 12th of 2019,
13  did you make any inquiries as to Pitts' location?
14   A.    Before the incident?
15   Q.    Correct.
16   A.    No.
17   Q.    Up until the -- Up until the incident, but
18  not including it, did anybody keep you informed of
19  Pitts' location in connection with him being in the
20  prison system?
21   A.    No.  I don't -- I don't recall if -- They
22  have a victim notification that I never got notified
23  he was out or anything.  You know, I signed up for
24  that, but I never got no notifications.



Page 18

1    Q.    So you were signed up for that -- And I was
2  going to get to that.  You were signed up for a victim
3  notification?
4    A.    I was, but I never got one.
5    Q.    Okay.  And is the victim notification that
6  you were signed up for -- is that something that you
7  had to go sign up yourself or was that done for you?
8    A.    I believe it's offered from Victim Witness
9  of Cook County.
10   Q.    And when it was offered, you accepted it?
11   A.    Yes.
12   Q.    And then what did you have to do to sign up
13 for that?
14   A.    It's a long time ago, and I believe I just
15 gave them my e-mail address.
16   Q.    Okay.  So as of March 13, 2019, which is
17 the day of the incident, your -- you were a detective;
18 is that correct, as of that date?
19   A.    Yes.
20   Q.    And you worked at Area -- Was it called
21 Area 2 or Area South at that time?
22   A.    Area South.
23   Q.    And which shift did you work that day,
24 March 13th?

Page 19

1    A.    Second watch.
2    Q.    What are the hours for that?
3    A.    Daytime hours.
4    Q.    Which are what?
5    A.    It varies.
6    Q.    What was it that day?
7    A.    I can't recall what time that day was.
8    Q.    It would be indicated on your ANA sheet for
9  that shift?
10   MR. SHINE:  I would object to the extent he's not
11 a 30(b)(6) witness.
12 BY THE WITNESS:
13   A.    They would have times on there, but that
14 doesn't necessarily mean they put it on an ANA.
15 Sometimes we come in earlier, sometimes we stay later.
16 So I don't know what's attached to an ANA.
17   Q.    So when you come in to work without regard
18 to the ANA sheet, do you sign in?
19   A.    No.
20   Q.    Do you know if you came in earlier than
21 your typical daytime hour shift on March 13th or later
22 or your regular time?
23   A.    I don't know.
24   Q.    Do you recall if you were working on

Page 20

1  anything in particular on March 13, 2019, that would
2  prompt you to come in either earlier or later than
3  your typical starting time?
4    A.    That would have me adjust hours?
5    Q.    Correct.
6    A.    I don't recall if we adjusted hours or
7  anything we were working on that day.
8    Q.    Who was your partner as of March 13, 2019?
9    A.    Detective Hill, H I L L.
10   Q.    And what kind of crime did you -- were you
11 investigating at that time?
12   A.    We were assigned to cold case squad.
13   Q.    As of March 13, 2019, who did you live
14 with?
15   A.    My family.
16   Q.    And who else -- Who was that?
17   A.    Wife and three sons.
18   Q.    And how old are your sons?
19   A.    Currently?
20   Q.    Well, as of March of 2019 or currently,
21 either way is fine, but just --
22   A.    Currently, they're 18, 17, and 11.
23   Q.    And as of March 13th of 2019, did your wife
24 work?

Page 21

1    A.    Yes.
2    Q.    And what were her typical working hours at
3  that time?
4    A.    Daytime hours.
5    Q.    Like, 9:00 to 5:00?
6    A.    Her shifts varied too.
7    Q.    So you indicated that -- on March 13, 2019,
8  you indicated that somebody came to your door --
9  somebody came to your door; is that correct?
10   A.    Yes.
11   Q.    And what time was that, roughly?
12   A.    Late afternoon hours.
13   Q.    What time?
14   A.    I don't recall the exact time.
15   Q.    Who was home at that time when the person
16 came to your door?
17   A.    One of my sons.
18   Q.    And that was the one who is now 11?
19   A.    The one who's 11 and there was another son
20 that I didn't know was home that was in the bedroom.
21   Q.    And which son was that, the older one or
22 the middle one?
23   A.    I don't recall which one was it, but I know
24 it was one.



Page 22

1    Q.    And was your wife home or at work at that
2    time?
3    A.    She was not home.
4    Q.    Was she working to your knowledge?
5    A.    I don't know where -- if she was at work or
6    if she was coming back from work or if she stopped for
7    shopping.  I don't know exactly where she was or if
8    she was still at work.
9    Q.    When this person came to your door on
10   March 13th, was it still light outside?
11   A.    Yes.
12   Q.    Okay.  And did this person knock on your
13   door or ring the bell?
14   A.    At the time, they did knock on the door.
15   Q.    And who answered the door?
16   A.    My son, the 11-year-old.
17   Q.    And what's his name?
18   MR. SHINE:  I would object.
19   MR. FOX:  To what?
20   MR. SHINE:  To the extent you're seeking
21   information relative to a minor.
22   MR. FOX:  We can keep this -- I don't know that
23   it's privileged or not.  We can keep this confidential
24   if you're concerned about them.

Page 23

1    MS. DORY:  If we're going to do a name, can we do
2    the initials?
3    MR. FOX:  Sure, the initials are fine.
4    BY THE WITNESS:
5    A.    D.
6    Q.    And then this individual talked to D before
7    you got to the door?
8    A.    Yes.
9    Q.    And so how did it come to pass that you
10   came to the door?
11   A.    He yelled for me.
12   Q.    Your son?
13   A.    Yes.
14   Q.    And when he yelled for you, what did he
15   say?
16   A.    He asked me to come to the front door.
17   Q.    And so I take it you went to the front
18   door?
19   A.    Correct.
20   Q.    So when you went to the front door, what
21   happened?
22   A.    I encountered the subject on my front
23   porch.
24   Q.    And describe him, his physical appearance.

Page 24

1    A.    He was a male around mid 30s, lower 30s; my
2    height, larger build; corn rolls in his hair, unkept;
3    he was wearing a leather jacket, 8 Ball leather
4    jacket.
5    Q.    A what?
6    A.    An 8 Ball leather jacket.  It had an 8 ball
7    on it.
8    Q.    It had the words eight ball on it?
9    A.    No.  It was an actual 8 ball from a pool
10   game.
11   Q.    Okay.
12   A.    That's all I could recall.  I can't recall
13   the T-shirt he was wearing or a sweatshirt underneath
14   or what pants he was wearing.
15   Q.    He said he was about your height.  How
16   tall?
17   A.    He would be between, I'd say, five, nine
18   and six foot.
19   Q.    Did he have any distinguishing marks on his
20   face, like tattoos or any other distinguishing marks?
21   A.    None that I can recall.
22   Q.    Was he wearing glasses?
23   A.    No.
24   Q.    Did he have facial hair?

Page 25

1    A.    Yes.
2    Q.    Do you remember anything else about his
3    description other than what you've already indicated?
4    A.    No.
5    Q.    So when you got to the door, what was the
6    conversation that occurred?
7    A.    When I got to the door, I asked him if I
8    could help him and he asked me a question.
9    Q.    What was the question?
10   A.    He asked me if I wanted to sell my car.
11   Q.    And then how did the conversation proceed
12   from there?
13   A.    I told him the car wasn't for sale.
14   Q.    And then what happened?
15   A.    He said I'll catch you later or I'll see
16   you later, at which time he went back -- hurried back
17   to his car, jumped in the car and took off.
18   Q.    And was your son present when this
19   conversation occurred?
20   A.    I don't recall.  I don't believe so.
21   Q.    So when he asked about if you wanted to
22   sell your car, did he say what type of car he was
23   referring to?
24   A.    While he was speaking, he glanced over to



1   where the car was in the back of my driveway.
2       Q.    So at your house, you had your car parked
3   in your driveway?
4       A.    It was in the back.  It was halfway down
5   the lane.
6       Q.    So can you describe for me -- Does the
7   driveway -- You say halfway down your driveway.  Does
8   the driveway go from the street back to a garage
9   toward the back of your house?
10      A.    Correct.
11      Q.    Okay.  And is your driveway -- is it
12  located to one side or the other of your house?
13      A.    It's -- would be on the south side -- The
14  driveway is on the south side of the house.
15      Q.    And you have a garage at the rear of the --
16  at the end of the driveway?
17      A.    Correct.
18      Q.    What kind of car?
19      A.    2001 Yukon.  That's it.
20      Q.    And did you have -- Was anything else said
21  that you haven't testified to between you and the guy
22  who came to your door?
23      A.    I don't recall.
24      Q.    And did he say -- did he say anything of a

1   threatening nature to you?
2       A.    Just that -- No.  As a threat, no.
3       Q.    At the time that you were having the
4   conversation with him, did you recognize him at that
5   time?
6       A.    As I was speaking with him, I -- it came to
7   my head that that might be Mr. Pitts.
8       Q.    And I take it the guy you were speaking
9   with at the front door did not identify himself or did
10  he?
11      A.    Did not.
12      Q.    Did you ask him to identify himself?
13      A.    No.
14      Q.    And why did you -- why did -- Why did you
15  think it might be Pitts as you were speaking to him?
16      A.    He just reminded me of him at the time.
17      Q.    Did he look like him in your mind?
18      A.    That's who he reminded me of, very -- To
19  look at him, I thought this might be him.
20      Q.    And then you said -- after you said the car
21  was not for sale, he said words to the effect of I'll
22  catch you later and he hurried back to his car; is
23  that correct?
24      A.    Correct.

1       Q.    And where was his car parked?
2       A.    Directly in front of my residence.
3       Q.    Was it in a legal parking zone in front of
4   your residence?
5       A.    Yes.
6       Q.    I take it you observed him as he went into
7   his car?
8       A.    I did.
9       Q.    And what kind of car was it?
10      A.    It was a silver-gray SUV.
11      Q.    What make and model?
12      A.    Unknown.
13      Q.    I'm sorry?
14      A.    I don't know.
15      Q.    You said that while you were talking to him
16  it occurred to you that it could be Mr. Pitts,
17  correct?
18      A.    Correct.
19      Q.    Okay.  Did -- As he was -- How far from
20  the -- How far from your front door where you were
21  standing is the street where his car was parked,
22  roughly?
23      A.    Distance-wise I couldn't -- There's a
24  parkway, a sidewalk, and then my front lawn.

1   Distance, I don't know how -- what the measurement
2   would be.
3       Q.    All right.  Did you catch the license plate
4   of the car?
5       A.    No.
6       Q.    You said it was a silver-gray SUV.  Was it
7   a dark colored silver gray or a little color or a
8   medium or how?
9       A.    I don't -- The tint of it I can't recall.
10      Q.    I'm sorry?
11      A.    The tint of the color I can't recall.
12      Q.    Did it appear to be a newer SUV or an older
13  one -- an older model?
14      A.    It appeared to have -- It was older, but
15  not old.
16      Q.    And I take it since you were -- considered
17  that it might be Mr. Pitts while he was at your door,
18  you were intent on looking at the car that he was
19  getting into to see if you could identify it?
20      A.    Yes.  I'm sorry.  Is that when I was
21  approaching?
22      Q.    I'm sorry?
23      A.    When I was approaching the car?
24      Q.    Well, did you approach the car?



1    A.    Well, I attempted to on my porch and the
2  car drove away.
3    Q.    So as he was getting in -- Well, as he
4  exited -- or as he exited the area of your front
5  porch, did you follow -- started following him out?
6    A.    Yes.
7    Q.    And when you said -- Did -- Withdraw that.
8         Did he run to his car or just walk quickly
9  or some other fashion?
10    A.    He -- It wasn't a run, but it was a fast
11  walk.
12    Q.    And how close to his car did you get when
13  you were walking toward his car before he exited?
14    A.    I don't recall.
15    Q.    Did you see the license plate?
16    A.    I saw that there was a plate on the car.  I
17  could not read the numbers on the plate by the time I
18  got up to the sidewalk.
19    Q.    And so after he left the area, what did you
20  do in connection with that conversation?
21    A.    I went back in the house.
22    Q.    And what did you do then regarding that
23  event?
24    A.    I went back to work.

1    Q.    So this incident when you were home
2  happened in the middle -- somewhere during the time of
3  your work shift?
4    A.    I believe it happened while I was at work,
5  it was in the middle of shift or outside of my normal
6  shift hours.  I can't recall.
7    Q.    Well, if you went back to work, then it
8  would have been somewhere during the time of your
9  shift; is that a fair statement?
10    A.    Can you -- When you mean by shift, you
11  mean that's -- We usually have a shift and then we
12  work extra hours.  Are you considering that part of
13  shift as the extra hours?
14    Q.    Let me rephrase it.  You weren't done for
15  the day at work at the time this incident happened?
16    A.    Correct.
17    Q.    And why did you -- Why were you home at
18  that point in time if you were working?
19    A.    I came home to grab something eat and make
20  the 11-year-old mac and cheese.
21    Q.    Was this lunch or dinner or what?
22    A.    It could have been in between.  It could
23  have been dinner.
24    Q.    So when you went back -- You said you went

1  back to work.  Does that mean you went back to the
2  area on 111th Street?
3    A.    Correct.
4    Q.    And when you went back to work, did you
5  report it to somebody -- somebody else at work?
6    A.    Yes.
7    Q.    And did you do that right away when you
8  went back to work?
9    A.    I don't recall exactly how much time had
10  passed because we were -- I had some other duties to
11  attend to, but I believe the first time I had a chance
12  to talk to somebody I did.
13    Q.    And who was the first person you talked to
14  about it?
15    A.    Sergeant Beck.
16    Q.    What time was it, roughly, that you talked
17  to Sergeant Beck?
18    A.    I don't recall.
19    Q.    And what did Sergeant Beck say about it to
20  you when you reported it?
21    A.    He asked me what the circumstance were.
22    Q.    And did you describe the circumstances?
23    A.    Yes.
24    Q.    Did you describe basically what we've been

1  talking about here occurred on your front porch?
2    A.    Yes.
3    Q.    And did you tell Sergeant Beck that you
4  believed or you thought it could be Pitts?
5    A.    Yes.
6    Q.    And did you tell him -- Did you tell
7  Sergeant Beck what you base that on that you believe
8  it might be Pitts?
9    A.    When I arrived back to the area, I first
10  checked to see if the Illinois -- IDOC, the Illinois
11  Department of Corrections website, to see if he was
12  out because I had no idea, at which they had him
13  listed as discharged.
14    Q.    So you looked on the -- When you got back,
15  the first thing you did is look at the Illinois
16  Department of Corrections website where they list the
17  inmates?
18    A.    It might not have been the first thing, but
19  it was one of the things I did when I first got there.
20    Q.    And then what else did you do in connection
21  with this incident when you got there?
22    A.    To this incident?
23    Q.    Correct.
24    A.    I ran Mr. Pitts' name through a Google



Page 34

1  search.

2      Q.    This is on a computer at work?

3      A.    Yes, one of the front computers.

4      Q.    And how did you spell his name when you ran

5  it?

6      A.    I don't recall.

7      Q.    When you ran the name, what information, if

8  any, came up?

9      A.    A picture came up of someone with the name

10 Jokim or Jokim or an abbreviation of that, last name

11 Pitts.  It was himself in a leather jacket with a

12 female.

13     Q.    I'm sorry?

14     A.    It was a picture of him with a female.

15     Q.    And he was wearing you said a leather

16 jacket?

17     A.    Yes.

18     Q.    Was it the same leather jacket that you

19 believe you had seen at your house?

20     A.    No.  It was different.

21     Q.    And what was the spelling of the Jokim that

22 came up on the Google search?

23     A.    Oh, I don't recall.

24     Q.    And was there a name -- Did his name show

Page 35

1  up on Google search Jokim Pitts or it's just what came

2  up when you ran?

3      A.    There was several different variations of

4  that name, but the picture is what drew my attention

5  to it because that was the picture -- it looks like

6  the person who was on my porch.

7      Q.    Did you print out that picture?

8      A.    At some point -- I don't know if I printed

9  it out or if somebody else printed it out that was

10 working on the case.  At one point, though, I did see

11 a printout copy of the picture.

12     Q.    And where is that printout of that -- copy

13 of that picture now?

14     A.    I don't know.

15     Q.    To your knowledge, would it be in the

16 detective file?

17     A.    I don't know.

18     Q.    You said you saw it at one point in time

19 printed out, correct?

20     A.    Yes.

21     Q.    When you saw it printed out, where was it?

22     A.    I saw it on a desk.

23     Q.    Whose desk?

24     A.    The floor desk.

Page 36

1      Q.    And what's the floor desk?  What is that?

2      A.    That's -- Area South has one big floor

3  where they have different parts of the area working in

4  a work space.

5      Q.    And who has access to the floor desk?

6      A.    At times 280 detectives.  280 detectives at

7  the time and some outside units that come in and use

8  the space.

9      Q.    The female that was in the picture, can you

10 describe what she looked like?

11     A.    She was shorter and in mid 30s, maybe --

12     Q.    What race?

13     A.    -- off of recollection.

14     I don't recall exactly what race.

15     Q.    Do you know if she was black?

16     A.    No.

17     Q.    Do you know if she was white?

18     A.    She -- I don't know if she was white or

19 black.  She was definitely more of a skin hinted -- or

20 a darker pigmented, so I don't know if she was white

21 or she had a good tan or she was of a Mediterranean

22 descent or something else.

23     Q.    Do you remember what hair style she had or

24 her color hair?

Page 37

1      A.    No.

2      Q.    Do you remember her color eyes?

3      A.    No.

4      Q.    Do you remember what she was wearing in the

5  picture?

6      A.    No.

7      Q.    Do you remember her age, roughly her age?

8      MR. SHINE:  I'm going to object to speculation.

9  BY THE WITNESS:

10     A.    I would say later than 20s, but more maybe

11 in her 30s.  That was a guess.

12     Q.    So once you did the Google search and you

13 came up with that picture, what was -- what else did

14 you do?

15     A.    That's -- I had that picture when I

16 approached Sergeant Beck.

17     Q.    Had you printed it out at the time you

18 approached Sergeant Beck?

19     A.    No.

20     Q.    So you had it on your computer screen?

21     A.    I had to look at -- I looked at it on the

22 computer screen.  I don't know if it was left on the

23 computer screen or if I exited out of there.

24     Q.    So -- And then you told -- At the time you



1    talked to Sergeant Beck, you told him that you had
2    done this -- you told him about the incident and you
3    told him about your Google search?
4        A.    Correct.
5        Q.    And what did Sergeant Beck say that he
6    would do about it, if anything?
7        A.    After telling him the circumstances, that
8    we talked about several ways to document what had
9    happened and he said -- he suggested the best way
10   sounds like we have to make out a stalking incident
11   report.
12       Q.    Did you run any other searches on Pitts on
13   any database at the police department that day?
14       A.    I don't believe I did, no.
15       Q.    And I'm including LexisNexis.  You have
16   access to that, correct?
17       A.    I do not, no.
18       Q.    What other databases do you have -- Do you
19   have Accurate?  Do you use that database?
20       A.    I don't have access to that database.
21       Q.    And you didn't run his name in any other
22   CPD databases?
23       A.    I did not that I recall.
24       Q.    So then you said -- So after this

1    conversation with Sergeant Beck where he indicated to
2    you to the effect of making out a stalking report,
3    what did you do?
4        A.    I asked him if I should go to the district
5    or go down to another district; and at that time, he
6    assigned a brand-new detective who just came from the
7    streets.
8        Q.    I'm sorry?
9        A.    He assigned a detective, a brand-new
10   detective that was still going through his training to
11   fill out a case report because he just came from
12   patrol -- from patrolling.
13       Q.    And who was that detective?
14       A.    His first name is Pat, I don't know how to
15   spell or pronounce his last name.
16       Q.    It begins with a K?
17       A.    I believe so.
18       Q.    And did you talk to him at the area about
19   what had happened?
20       A.    Yes.  He interviewed me.
21       Q.    By the way, when you talked to Sergeant- --
22   when you were talking to Sergeant Beck about it, did
23   you indicate to him that the person at your front door
24   had threatened you in any fashion?

1        A.    No.  That's why we didn't make an assault.
2        Q.    Okay.  So then you said you talked to this
3    Detective Pat and -- at the station, correct?
4        A.    Yes.
5        Q.    And did you describe for him what occurred
6    at your front door?
7        A.    Yes.
8        Q.    Okay.  Did you describe it much the same as
9    you just described it here just now or was it any
10   different?
11       A.    I don't -- I don't recall if there was any
12   differences.
13       Q.    Do you recall if the detective asked you
14   for a description of who it was that was at your front
15   door?
16       A.    I don't recall the specific questions he
17   asked me during that interview.
18       Q.    You said a few moments ago that he was a
19   brand-new detective.
20       A.    Correct.
21       Q.    Did you yourself have any issues with
22   Sergeant Beck assigning a brand-new detective to do --
23   to work this case?
24            MR. SHINE:  I just object to relevance.

1            MS. CAMPBELL:  Join.
2    BY THE WITNESS:
3        A.    I had no objections to that.
4        Q.    I'm sorry?
5        A.    He's not a -- The subject was not a new law
6    enforcement officer, he was a new detective.  And
7    detectives -- Anybody with a certain number of years
8    can't get access to the ARA (phonetic) reporting
9    system.  I do not have access to it, neither does a
10   lot of the other detectives, but people who just came
11   from patrol do; so I think that's why he assigned him
12   to do the case report because he just came from patrol
13   and he has access to that system.
14       Q.    What system are you referring to?
15       A.    ARA.
16       Q.    What is that?
17       A.    It's how they generate -- consider reports,
18   case reports.
19       Q.    How do you spell that acronym, ARA?
20       A.    I have no idea.
21       Q.    So I guess I'm kind of -- I'm a little bit
22   confused.  As a detective, are you allowed to access
23   case reports?
24       A.    I get the case reports through a system



Page 42

1  called the CRIS (phonetic) system which is detective
2  reports; and they're connected, but we cannot generate
3  the ARA reports.  You can only do the supplemental
4  reports that are contained in CRIS.
5      Q.   What's the difference between the
6  two reports?
7      A.   They're two systems, two different systems.
8      Q.   Okay.  And was there a specific reason
9  why -- Was there a preference for the system the
10  detective had access to?
11     A.   That's how you generate the incident
12  reports, the initial general case report.
13     Q.   All right.  So what would have happened if
14  he assigned this to a detective that didn't have
15  access to that?  How would it go?
16     A.   He would have assigned a patrol officer
17  either down stairs or 22nd Street.
18     Q.   So did you talk with the detective at
19  111th Street that day?
20     A.   Yes.
21     Q.   Okay.  Do you remember what time it was you
22  talked to him?
23     A.   No.
24     Q.   How much time did you spend talking with

Page 43

1  him?
2      A.   I don't know.
3      Q.   After you were done talking with the
4  detective, what did he say that he was going to do in
5  connection with the information you had given him?
6      A.   He was going to submit the report for
7  approval.
8      Q.   So I want to look at a document.  It's
9  Bates-stamped FCRL66, 67, and 68.  It's the original
10  case incident report and we'll call this Exhibit 1.
11  And if you could look at it -- if you could look at
12  the -- This appears to be the report of Patrick Kenah;
13  and if you could look at the second page, there's a
14  narrative toward the bottom, if you could read that to
15  yourself, I want to ask you about it.
16              (Witness peruses document.)
17  BY THE WITNESS:
18     A.   Okay.
19     Q.   Okay.  First, have you seen this case
20  incident report before?
21     A.   No.
22     Q.   In the narrative, it says -- describes the
23  incident that you had and it says that -- right around
24  the middle of it, it says "The offender left off the

Page 44

1  porch and entered into a dark gray Mercury SUV and
2  drove off."  So does that refresh your recollection
3  that you described the vehicle as a dark gray Mercury
4  SUV?
5      MR. SHINE:  I've going to object to speculation
6  and mischaracterizing testimony.
7      MS. CAMPBELL:  Join, foundation.
8  BY THE WITNESS:
9      A.   It's been over a year.  I don't exactly
10  know.  I mean, he wouldn't have put it down there if I
11  didn't say anything, but I don't recall the exact
12  describers I gave him at that time.  I don't know
13  exactly what, you know, the process was.  I can't
14  recall exactly what I said.
15     Q.   Okay.  Do you have any reason to believe
16  that the description of a dark gray Mercury SUV is
17  incorrect or a mistake by Detective Kenah?
18     MR. SHINE:  Objection, speculation.
19  BY THE WITNESS:
20     A.   I don't believe that that's a mistake, that
21  he made a mistake in putting down a gray Mercury.
22     Q.   Having read this, that this is how the car
23  is described in this report, does that refresh your
24  recollection as to the way the car looked on that day?

Page 45

1      A.   It doesn't refresh -- I'm not the best with
2  cars.  If it's between a Mercury or a Buick, I'm
3  not -- I just know in the first place gray and silver
4  are very close.  Little describers I don't think make
5  a difference.  So I don't believe that this is
6  incorrect or correct.  I just don't recall what I
7  said.
8      Q.   Okay.  When you said you're not that good
9  with cars, what do you mean by that?
10     A.   Well, today's cars, I couldn't really tell
11  you if it was a -- a certain model on some of the
12  cars, the SUVs.  So if it said Mercury or if it said
13  another car, I don't know what, it really -- I don't
14  know.
15     Q.   So when you say you're not so good at cars,
16  are you saying that if you were to look at a car, you
17  wouldn't know what kind of car it is without seeing it
18  written on the car Mercury or Ford or Chevy or Toyota
19  or whatever?
20     A.   Correct.  I'd have to see it say -- have an
21  emblem on it like a BMW on it.  It would have to say
22  Jeep on it, you know, to know what some of these cars
23  are, not all of them, but some of them, especially
24  some of the off brands.  I guess that would be some of



1 the other cars.

2     Q.   All right. So hypothetically, if this is

3 correct, that you told Detective Kenah that it was a

4 dark gray Mercury SUV, you would have seen the words

5 Mercury or the emblem from Mercury on the car?

6     A.   I could have described it as a Mercury or a

7 dark gray, but silver or gray colored SUV. I might

8 have said dark at the time. I just don't recall

9 exactly what words I used. Even though I see it

10 there, I still don't remember exactly what I said. Is

11 it far off of what I said earlier of a SUV, is it gray

12 or silver, I don't believe there's much of a

13 difference unless it's, you know, a different car.

14     Q.   Did you feel the car might be silver and

15 not gray, is that why you're saying that?

16     A.   The car -- At the time -- Now, I don't know

17 because the distance between now and when I saw this

18 and what I said then, when I described it to him back

19 then, he might have put down dark Mercury. I don't

20 know exactly what words I used. Did I describe a dark

21 Mercury or maybe I didn't use the word Mercury, I

22 don't recall. I don't know. I don't exactly know

23 exactly what words I used. Now what I remember as of

24 today is it's either gray or silver SUV.

1     Q.   So you don't know if it was a Mercury or

2 not?

3     A.   No.

4     Q.   And as of today, do you know if it a dark

5 gray or silver SUV or medium gray or silver or a light

6 gray or silver?

7     A.   I do not.

8     MS. DORY: Do you mind if we take a break real

9 quick?

10     MR. FOX: Sure.

11               (A short break was taken.)

12     MR. FOX: So did you want to note who is not

13 present anymore?

14     MS. DORY: Could we note on the record, please,

15 that Iris Chavira has left the deposition for the City

16 of Chicago, but Andrea Campbell is still present.

17     MR. FOX: All right.

18 BY MR. FOX:

19     Q.   When we took a break, we were looking at

20 this report. And going back to the report, Exhibit 1,

21 it says -- under the section that I was reading about

22 the car, it says, "Detective Barsch also found it

23 curious that the offender would not knock on his door

24 and inquire about buying a vehicle that was clearly

1 not for sale. Detective Barsch, totaling these

2 circumstances in his head, searched for the offender

3 on Facebook and CPD databases and learned ..." and it

4 goes on. So it says there that you did search on CPD

5 databases. And does reading that -- And you said

6 before that you don't recall searching any CPD

7 databases. I'm just wondering if reading that

8 refreshes you into any particular databases that you

9 looked at.

10     MR. SHINE: I'm going to object to speculation

11 and mischaracterizing prior testimony.

12     MS. CAMPBELL: Join.

13 BY THE WITNESS:

14     A.   I do not recall looking at any CPD

15 databases at that time.

16     Q.   Do you know of any officer at -- or boss or

17 supervisor at the area that did look at any CPD

18 databases?

19     MR. SHINE: Objection, speculation.

20     MS. CAMPBELL: Join.

21 BY THE WITNESS:

22     A.   I don't know.

23     Q.   Did anybody, either Sergeant Beck or any

24 detective, tell you that they had looked at any CPD

1 databases?

2     A.   I don't recall.

3     Q.   And then a little while ago you were

4 talking about the photograph that you found on

5 Facebook with the woman and Pitts. And I want to

6 know, did you show that photograph to the detective

7 who took this report?

8     A.   I don't recall if I showed him the

9 photograph or not.

10     Q.   Did you show that photo -- Do you recall

11 showing that photograph to any particular officer or

12 sergeant or anybody?

13     A.   Off my recollection, no, I don't recall.

14     Q.   Did you find out the name of the woman who

15 was in the photograph?

16     A.   I don't recall.

17     Q.   Do you know if anybody found out the name

18 of the woman in the photograph?

19     MR. SHINE: Objection, speculation.

20 BY MR. FOX:

21     Q.   If you know.

22     MS. CAMPBELL: Join.

23 BY THE WITNESS:

24     A.   I don't know.



Page 50

1    Q.    Now, you talked to the detective, and it
2  says here the name is Patrick Kenah.  Does that sound
3  right to you?
4    A.    Sound right?  I don't know.
5    Q.    Okay.
6    A.    I know his first name was Pat.
7    Q.    Okay.  Whatever detective you spoke with,
8  that was the same day as the incident, correct; it was
9  March 13th you spoke with him?
10   A.    Yes.
11   Q.    And after you spoke with the detective and
12  gave him -- he interviewed you about this
13  incident, what was the next thing you did in
14  connection with it?
15   A.    In connection with this case?
16   Q.    Correct.
17   A.    That was it for that night.
18   Q.    Okay.  So what was the next thing you did
19  on another occasion, another day?
20   A.    I saw a video at my neighbors' house.
21   Q.    Which neighbor was this?
22   A.    I don't know their name.
23   Q.    You saw it at their house?
24   A.    Yes.

Page 51

1    Q.    And how did that come to pass that you saw
2  a video at your neighbors' house?
3    A.    I was asked to go down and take a look at
4  the video.
5    Q.    And you were asked to go down where, to the
6  neighbors' house?
7    A.    Correct.
8    Q.    And is this a house -- Where was this
9  house?
10   A.    It was north and west of my house.
11      (PURSUANT TO PROTECTIVE ORDER PAGE 51, LINE 14,
12  THROUGH PAGE 52, LINE 14 WERE BOUND UNDER SEPARATE
13  COVER.)
14
15
16
17
18
19
20
21
22
23
24

Page 52

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15      (PURSUANT TO PROTECTIVE ORDER PAGE 51, LINE 14,
16  THROUGH PAGE 52, LINE 14 WERE BOUND UNDER SEPARATE
17  COVER.)
18   Q.    And is this Teres (phonetic) Cleary?
19   A.    No.
20   Q.    How about -- I'm going to say someone
21  else -- do you know who Teres Cleary is?
22   A.    That's my neighbor across the street from
23  me.
24   Q.    She lives directly across the street from

Page 53

1  you?
2    A.    Correct.
3    Q.    And then how about Linda Reed?  Do you know
4  that name?
5    A.    No.
6    Q.    Joe Dass (phonetic)?
7    A.    No.
8    Q.    Larry Ashbrook?
9    A.    No.
10   Q.    And the neighbors that you went to, you
11  don't recall the name?
12   A.    I do not.
13   Q.    But it was on ████ closer to 100th Street?
14   A.    Correct.
15   Q.    Was it on your side of the street or the
16  opposite side of the street?
17   A.    Opposite.
18   Q.    Roughly, how many -- how many houses from
19  the corner was it, roughly, of 100th?
20   A.    Roughly?
21   Q.    Roughly.
22   A.    It was only a couple.  It wasn't the
23  corner.  It wasn't the next one.  It might have been
24  two or three.  I don't know.



Page 54

1    Q.    Okay.  So who was present when you viewed
2 the video?
3    A.    I'm not sure.  I don't recall everybody who
4 was there.
5    Q.    Were any other CPD personnel there other
6 than yourself?
7    A.    Yes.
8    Q.    Do you remember who that was?
9    A.    Detective Gillerlain was there.
10   Q.    Anybody else that you can recall?
11   A.    I don't recall off the top of my head.
12   Q.    Were there others there, though, that you
13 just don't recall right now?
14   A.    I recall that the neighbors that were on --
15 were in another room while we were looking at the
16 video, they were home; but that's it.
17   Q.    All right.  And then when you saw the
18 video, did you see anything of interest?
19   A.    A few cars that went by.
20   Q.    And were any of the cars cars that you
21 had -- that you thought had seen before?
22   A.    I couldn't positively identify the cars
23 that I saw -- that I might have saw before.
24   Q.    And did you tell that to the other -- to

Page 55

1 the other -- Well, you said Detective Gillerlain was
2 there?
3    A.    Yes.
4    Q.    I take it you told him you couldn't
5 positively identify any cars in the video?
6    A.    There were a couple cars that looked like
7 it, but I couldn't make an  identification off the
8 video.
9    Q.    So did you tell Detective Gillerlain that
10 there was a car that looked like it or words to that
11 effect?
12   A.    There might have been a couple cars, I
13 don't recall.  I believe that there was a couple cars
14 that may have went through during the time frame,
15 which car I can't really recall.
16   MS. DORY:  I think we need to mute one of the
17 computers.
18          (Brief pause.)
19 BY MR. FOX:
20   Q.    Were any of the cars that you saw that you
21 thought might look like it -- were any of those a dark
22 gray Mercury SUV?
23   A.    I don't recall.
24   Q.    Were -- Any of the cars that you thought

Page 56

1 might look like it, do you recall the color of those
2 cars?
3    A.    I can give you vague there's a couple SUVs
4 that went by that were silver or gray color.
5    Q.    But you don't know the make or model of any
6 of them?
7    A.    No.
8    Q.    In that area, in the -- is ▮▮▮ a busy
9 street in that area?
10   MR. SHINE:  Objection, speculation.
11 BY MR. FOX:
12   Q.    On your block.
13   A.    No.
14   Q.    How much time did you spend at the
15 neighbors' house looking at video?
16   A.    Not long.
17   Q.    Okay.  Like, under a half hour?
18   A.    I can't recall exactly when, but it wasn't
19 long at all.
20   Q.    All right.  Was this video -- to your
21 knowledge, was it taken in to custody?
22   A.    I don't know.
23   Q.    And which day was this?  Was this one day
24 after the incident, March 14th, or was it a different

Page 57

1 day?
2    A.    I don't really recall the date.  I believe
3 it was right after the day that it happened, but it
4 might have been days later.  I'm not sure.
5    Q.    All right.  Did you look at any more video
6 after this video that you just described looking at?
7    A.    No.
8    Q.    And so after you looked at the video, what
9 else, if anything, did you do in connection with this
10 case?
11   A.    Nothing.
12   Q.    Did any other defendants or any CPD
13 personnel come and question you again about the
14 incident after the first day of questioning that you
15 described?
16   A.    No.
17   Q.    On March 14th, the day that -- the day that
18 you believe you looked at the video, did
19 Detective Gillerlain interview you again about the
20 incident?
21   A.    On the 14th?
22   Q.    Correct.
23   A.    I mean, he talked to me while we were
24 watching the video, but that's all I -- I don't know



Page 58

1  if it was an interview or if he was just asking
2  questions about the video or -- It was very -- We
3  spent a little bit with the video.
4      Q.   All right.  I'm going to -- And other than
5  that, the time period looking at the video and the day
6  before when you were talking to the detective who you
7  gave the description of what happened to you, do you
8  remember anybody else ever talking to you again about
9  this incident from the CPD?
10     A.   No.
11     Q.   So I'm going to ask you to look at now
12 Bates-stamped -- we'll call this Exhibit 2 -- FCRL112
13 and 113.
14     MS. DORY:  Is that the Investigative Alert?
15     MS. DIAZ:  It's the alert.
16     MR. FOX:  It's the alert.
17 BY MR. FOX:
18     Q.   So on these two pages there's an
19 investigative alert; and my first question is, did you
20 ever see this before?
21     A.   No.
22     Q.   Okay.  This -- On the first page, FCRL112,
23 it describes the vehicle as a Mercury Mountaineer
24 Sport.  Do you see that toward the bottom?

Page 59

1      A.   Yes.
2      Q.   Do you ever remember describing it as a
3  Mercury Mountaineer Sport?
4      A.   I don't recall.
5      Q.   Okay.  And it also describes the style as a
6  truck.  Do you ever -- Do you recall ever describing
7  the car as a truck?
8      A.   No.
9      Q.   If you go to the second page of this, which
10 is FCRL113, it says -- in the box -- and I'll just
11 read this for the record -- in the box of
12 Justification for Request, it says, "Pitts went to the
13 victim's residence," paren, "victim is active CPD, and
14 asked to buy the victim's car.  The victim informed
15 Pitts that the vehicle was not for sale and Pitts
16 conveyed a threat to the victim.  Pitts was previously
17 convicted of aggravated assault against the victim and
18 had recently been paroled for that crime."  So when it
19 says "Pitts conveyed a threat to the victim," is it
20 your testimony that that's not true that he conveyed a
21 threat to you?
22     MR. SHINE:  Objection to form and speculation and
23 mischaracterizing previous testimony.
24 BY THE WITNESS:

Page 60

1      A.   The one conversation I had with
2  Mr. Pitts --
3      Q.   Correct.
4      A.   -- on my front porch, there was no direct
5  verbal threat.
6      Q.   Okay.  Now, I want to show you what we're
7  going to mark as Exhibit 3 is FCRL127 through 131.
8  It's a Field Investigation Suspended Report,
9  Exhibit 3.  And then leaf through this and then I'm
10 just going to ask you if you recall seeing this report
11 before.
12              (Witness peruses document.)
13     MS. CAMPBELL:  I'm sorry.  Ed, what were those
14 Bates stamp numbers?
15     MR. SHINE:  127 through 131.
16     MS. CAMPBELL:  What's the name of the report?
17     MR. SHINE:  Case Supp Report.
18     MS. CAMPBELL:  Okay.  Thank you.
19 BY MR. FOX:
20     Q.   Have you seen this report before?
21     A.   No.
22     Q.   I'm just going to ask you about a couple
23 things in it.  If you go to page 4 of 5, and it's
24 FCRL130, it says -- and I'll just read it, it says --

Page 61

1  in about the third paragraph under "Investigation," it
2  says, "On 14 March 2019, at approximately 830 hours,
3  Detective Gillerlain conducted an interview of
4  victim," slash, "witness Detective Henry Barsch.
5  During the interview, Detective Barsch related the
6  same facts contained in the initial Chicago Police
7  General Offense Case Report documented on 13 March
8  2019."  So as far as you know, would this have been a
9  reference to the time that you were looking at the
10 video with Detective Gillerlain?
11     MR. SHINE:  Objection to speculation.
12 BY THE WITNESS:
13     A.   I don't know what he was referring to.
14     Q.   All right.  And then if you go to the next
15 page, 5 of 5, FCRL131, and then it says -- at the very
16 top paragraph, it says, "On 14 March 2019, during the
17 canvass, RDs recovered surveillance video footage
18 from," and it's redacted, "showing a silver SUV
19 driving north on," redacted.  "RD later showed the
20 victim the footage and he related that it looked like
21 the SUV that he saw at the time of the incident."  So
22 my question to you is, when you were viewing video on
23 March 14th at the neighbors' house, did you indicate
24 that the vehicle you saw on the video looked like the



Page 62

1   SUV that you saw at the time of the incident?
2       A.    I don't recall.
3       Q.    Were you made aware that Pitts was arrested
4   based upon your complaint?
5       A.    At what point?
6       Q.    At any point.
7       A.    I later found out that he was brought in.
8   I was told that he was contacted and then the
9   circumstances of everything, I was not -- I didn't
10  know of until this, these procedures.
11      Q.    So when you say "these procedures," you're
12  talking about this lawsuit we're here for today?
13      A.    Correct.
14      Q.    Okay.  So when he was -- At the time he was
15  arrested back on March 14th of 2019, you didn't find
16  out that day or even any time later that week that he
17  had been arrested?
18      A.    The term arrested, him being taken into
19  custody, I didn't know -- I was not informed the
20  extent of any -- any actions that were taken by
21  anybody, so I don't have any knowledge.  I was given
22  information regarding what he said during an interview
23  and what his claims were and what they were going to
24  do with the case at this point.  And that was it.

Page 63

1       Q.    So when you were given information about
2   what he was saying in the interview, was that to the
3   effect that he said he was at work at the time of the
4   incident that you allege that he was at your house?
5       A.    Yes.
6       Q.    Okay.  And you were told that they were
7   going to verify that?
8       A.    Yes.
9       Q.    Okay.  And do you remember who it was that
10  told you that?
11      A.    I think it was Todd Gillerlain.
12      Q.    I'm sorry?
13      A.    Mr. Gillerlain, Detective Gillerlain.
14      Q.    And Mr. Gillerlain -- Detective Gillerlain
15  is deceased now; is that correct?
16      A.    Correct.
17      Q.    Were you informed subsequently that it was
18  discovered that it was video showing that Pitts was at
19  work during the time that you said he was at your
20  house on March 13th?
21      A.    I was informed that there was video that he
22  may have been at work, that there's -- but he could
23  not be identified at work.
24      Q.    That what?

Page 64

1       A.    He could not be identified at work.  It was
2   grainy video and identification could not be made of
3   him physically being there.
4       Q.    And what, if anything, were you told about
5   subsequently by any member of the CPD in connection
6   with whether or not they believed Pitts to have been
7   at work or not?
8       A.    Their claim -- What I was told is that he
9   said he was at work, he spoke to some people at work,
10  and there might be a possibility that he was at work;
11  but Mr. Pitts was claiming that it was his brother and
12  not him at my house, and that was his claim at the
13  time.  And I that's what I was told.
14      Q.    So you were told by somebody at the CPD
15  that Pitts was saying his brother was at your house,
16  but not himself?
17      A.    Correct.
18      Q.    And who was it that told you that?
19      A.    Mr. Gillerlain.
20      Q.    And when -- At that point then, to your
21  knowledge, was there an investigation of Mr. Pitts'
22  brother going to your house?
23      A.    Yes.
24      Q.    And what did that encompass?  What were you

Page 65

1   told about that?
2       A.    They weren't -- They were going to bring
3   him in and talk to him when they get a chance.
4       Q.    And what came from that?
5       MR. SHINE:  Objection, speculation.
6   BY MR. FOX:
7       Q.    If you know.
8       A.    I still am waiting for that -- The
9   investigation is still ongoing.
10      Q.    Did anybody tell you that they had looked
11  for his brother or done anything in connection with
12  furthering that investigation?
13      A.    I haven't heard anything.
14      Q.    I'm sorry?
15      A.    I haven't heard anything.
16      Q.    Who was it that told you that they were
17  looking into his brother?
18      A.    Mr. Gillerlain.
19      Q.    To your knowledge, who was
20  Detective Gillerlain's partner?
21      A.    On that day?
22      Q.    Yes.
23      A.    I don't know off the top of my head.
24      Q.    Do you know, did Detective Gillerlain --



Page 66

1  did he work at 111th Street too?
2      A.    Yes.
3      Q.    Who was his partner at that time?
4  MR. SHINE:  Objection, speculation.
5  BY THE WITNESS:
6      A.    I don't know.
7      Q.    And to this day, have you ever found out
8  anything further about any further investigation of
9  Pitts' brother?
10     A.    No.
11     Q.    Has anybody indicated from CPD -- has
12  anybody indicated that they're furthering or
13  continuing to look at Pitts' brother?
14     A.    No.
15     Q.    Have you been -- Have you yourself made any
16  inquiries about this to anybody at CPD?
17     A.    That someone is actively looking for his
18  brother?
19     Q.    Correct.
20     A.    Except for the initial information I
21  received, nothing after.
22     Q.    Is it your intent to pursue an
23  investigation of Pitts' brother in connection with
24  this?

Page 67

1      MR. SHINE:  Let me just object to relevancy.
2  BY THE WITNESS:
3      A.    The -- My belief on the reporting of this
4  incident is that Illinois State stalking law,
5  third-party harassment or intimidation would still go
6  back to Mr. Pitts; so if it was his brother or not, it
7  doesn't matter.  A second such action, I think it's a
8  Class 3 felony, if Mr. Pitts or his brother do
9  approach my house again with intent to harass or
10  threaten me, that I already have documentation and I
11  would at that point have them arrested and charged
12  with felonies.
13     Q.    In your mind, if it was determined that it
14  was Pitts' brother that went to your house on
15  March 13, 2019, you would want him charged -- you
16  would want Jokim Pitts charged with stalking for that?
17     A.    How it's read in the statute, he possibly
18  could be depending on if he sent him there or if he
19  gave him information to go to my house as an attempt
20  to use a third party.  It's part of the statute.  So
21  that's why I haven't really pursued it because they
22  haven't showed back up at my house or made any attempt
23  to threaten or harass me, but that's why I have not
24  pushed this further.  If something else happens, I'll

Page 68

1  make another documentation and incident report of that
2  case and I'll present that to the State's Attorney's
3  Office then -- or I will call Chicago -- actually, I
4  will call the Chicago Police Department to present
5  that to the State's Attorney's Office.
6      Q.    Do you know what efforts anybody -- any
7  member of the Chicago Police Department did, if
8  anything, to ascertain if it was Pitts' brother that
9  went to your house?
10     MR. SHINE:  Objection to speculation.
11  BY THE WITNESS:
12     A.    I don't know.
13     MS. CAMPBELL:  Join.
14  BY MR. FOX:
15     Q.    Okay.  I want to show you another exhibit
16  which are your interrogatories, we'll call them
17  Exhibit 4.
18     MR. FOX:  Do you folks have those?
19     MR. SHINE:  Yep.
20     MR. FOX:  All right.
21  BY MR. FOX:
22     Q.    Before we look at this, I just wanted to
23  ask you, do you know what Pitts' brother looks like?
24     A.    No.

Page 69

1      Q.    Do you know his name?
2      A.    No.
3      Q.    Did any CPD personnel tell you that they
4  had seen a picture of his brother, Jokim Pitts'
5  brother?
6      A.    No.
7      Q.    And so do you know from any information if
8  Jokim Pitts' brother looks like Jokim?
9      MR. SHINE:  Objection to speculation.
10  BY THE WITNESS:
11     A.    I have no idea.
12     Q.    Going to these interrogatories, you have
13  them in front of you?
14     A.    Right here.
15     Q.    Do you recall responding to these --
16     A.    Yes.
17     Q.    -- or assisting with it?
18     Q.    Okay.  And if you look at the verification
19  which is the last page, I just want to ask -- make
20  sure it's your signature on the last page.
21     A.    It is.
22     Q.    Okay.  I just want to look through some
23  stuff, I might have covered everything I was going to
24  ask about this.



Page 70

1            (Brief pause.)

2  BY MR. FOX:

3     Q.    So if you can go to page 4 of Interrogatory

4  No. 8, it indicates at the last sentence of the answer

5  to No. 8 that to the best of your recollection, you

6  stated that you did have an opportunity to review

7  plaintiff's criminal history at some point, date

8  uncertain, because you learned he had been released

9  from custody.  So is that -- Is that accurate that you

10  looked at his criminal history at the police

11  department or somewhere else?

12     MR. SHINE:  Objection to mischaracterization of

13  prior testimony.

14     MS. CAMPBELL:  Join.

15  BY THE WITNESS:

16     A.    I believe I might have saw information on

17  him.  I did not pull it up, but I recall.

18     Q.    Right.  And it says here you had an

19  opportunity to review it.  Do you know who pulled it

20  up?

21     A.    No.

22     Q.    So I want to come back a minute to the --

23  You said Detective Gillerlain told you that Pitts said

24  that -- told him that it was his brother.  Do you

Page 71

1  recall your testimony on that?

2     A.    Yes.

3     Q.    Did -- To your knowledge, did -- where, if

4  anywhere, to your knowledge did Detective Gillerlain

5  document that?

6     MR. SHINE:  Objection to speculation.

7  BY THE WITNESS:

8     A.    I don't know.  I don't know if it's on any

9  of the reports.

10     Q.    If Pitts -- Jokim Pitts had said such a

11  thing, would you expect that to be documented in some

12  report?

13     MR. SHINE:  Objection.

14     MS. CAMPBELL:  Objection, improper hypothetical,

15  calls for speculation --

16     MR. SHINE:  Join.

17     MS. CAMPBELL:  -- foundation.

18  BY THE WITNESS:

19     A.    I don't know what they did on the reports.

20     Q.    Right.  You've been a detective for how

21  many years?

22     A.    14.

23     Q.    Okay.  So based on your experience as a

24  detective, if a suspect indicated -- and I'm just

Page 72

1  saying hypothetically now -- if a suspect indicated to

2  you that the suspect's brother did the act that was

3  being investigated, would you expect that to be

4  documented in some report?

5     A.    If I would document something that someone

6  told me?

7     Q.    Correct.

8     A.    I would.

9     Q.    And would you expect that of -- based on

10  your training, that generally such a thing would be

11  documented?

12     MS. CAMPBELL:  Objection, foundation, incomplete

13  hypothetical.

14  BY THE WITNESS:

15     A.    Yes.

16     MR. FOX:  All right.  Give us five minutes,

17  please.

18     MS. DORY:  Okay.

19     MR. SHINE:  Andrea, we're taking five.

20     MS. CAMPBELL:  Okay.  Thanks.

21         (A short break was taken.)

22     MR. FOX:  Just a little bit more.

23  BY MR. FOX:

24     Q.    At the time of this incident on March 13,

Page 73

1  2019, did you have video cameras at your house for

2  security to look at things outside or at your door?

3     A.    At that time, I did not.  I do now.

4     Q.    Okay.  And then also are you aware of any

5  reports documenting any pending investigation of Jokim

6  Pitts' brother?

7     MR. SHINE:  Objection to speculation.

8  BY THE WITNESS:

9     A.    No.

10     MS. CAMPBELL:  Join.

11     MR. FOX:  All right.  I have nothing further

12  then.

13     MR. SHINE:  Detective Barsch, we have just a few

14  follow-up questions for you.

15          CROSS-EXAMINATION

16  BY MR. SHINE:

17     Q.    Where are you currently assigned?

18     A.    Area South Cold Case -- I'm sorry.  Area 2

19  Cold Case Squad.

20     Q.    Counsel asked a few questions about the

21  2004 shooting that involved the plaintiff in this

22  matter and so I just want to ask a few questions about

23  that particular incident and your involvement there.

24  Did you measure the exact distance you were from



Page 74

1  Mr. Pitts at the time that you discharged your
2  firearm?
3      A.   No.
4      Q.   And did you ever get close enough to
5  Mr. Pitts at that time to be able to describe him?
6      A.   On the shooting --
7      Q.   Yes.
8      A.   -- during the shooting?
9      I was close enough to see him, yes.
10     Q.   And do you recall what the weather or
11 lighting was like that day?
12     A.   It was dark out and there was streetlights
13 on, yes.
14     Q.   During the interaction, was it clear enough
15 that you were able to actually see his face?
16     A.   Yes.
17     Q.   And Detective Barsch, you testified that
18 you -- also testified at his criminal trial; is that
19 correct?
20     A.   Correct.
21     Q.   At his criminal trial, was Mr. Pitts also
22 present there when you testified?
23     A.   Yes.
24     Q.   And approximately, how many times did you

Page 75

1  testify in his criminal trial?
2      A.   I believe I was there for more than a few
3  dates.  I testified at a motion and in the actual
4  trial itself, I believe.  Actually, I can't recall;
5  but it was several times I was in the courtroom.
6      Q.   And each time that you were in the
7  courtroom for the underlying criminal case related to
8  the 2004 shooting was Mr. Pitts present?
9      A.   Yes.
10     Q.   At Mr. Pitts' criminal trial when you
11 testified there, approximately, how far was Mr. Pitts
12 from you?
13     A.   We were in the courtroom, so whatever size
14 the courtroom was at 26th Street from the stand to the
15 table which is not that far.
16     Q.   And when you say "not that far," is it
17 10 feet?
18     A.   It could be -- It might be a little more
19 than 10 feet, but it's indoors with lighting.
20     Q.   And approximately, how long did you testify
21 for in his criminal trial?
22     A.   I don't recall, but it wasn't -- I was
23 there for some questioning.  I mean, I was there for
24 some time.

Page 76

1      Q.   And the entire time that you were
2  testifying, were you able to see Mr. Pitts or was it
3  obstructed in any way?
4      A.   I could see Mr. Pitts.
5      Q.   The entire time that you testified?
6      A.   Yes.
7      Q.   Jumping ahead a little bit to March of
8  2019, Detective Barsch, is it your routine practice to
9  sign in and out of work?
10     A.   No.
11     Q.   Do you have to clock in or clock out after
12 your shift or before your shift?
13     A.   No.
14     Q.   Is it fair to say that your times at work
15 could change depending upon business or case need?
16     A.   That's fair.
17     Q.   Are there times that you would potentially
18 go in early?
19     A.   Yes.
20     Q.   And potentially work late?
21     A.   Yes.
22     Q.   So in March of 2019, the date that who you
23 believe Mr. Pitts knocked on your door, I just want to
24 talk and walk through that a little with you further.

Page 77

1  You testified that your son yelled for you; is that
2  correct?
3      A.   Correct.
4      Q.   Can you describe what his demeanor was like
5  at that time?
6      A.   It a, like, hurry up dad yell.
7      Q.   A hurry up dad yell?
8      A.   Yeah.  He yelled, like, dad, hurry up, come
9  here, there's someone here.  It was more of a --
10 That's the best way I can describe it.  He wasn't
11 nonchalant about it.
12     Q.   Did it seem urgent to you?
13     A.   Yes.
14     Q.   Did it seem like your son was scared?
15     A.   Yes.
16     Q.   Detective Barsch, was it unusual for
17 someone to knock on your door like this?
18     A.   No.
19     Q.   Had anyone ever knocked on your door like
20 this before where your son became what you testified
21 to as being -- or appearing scared?
22     A.   No.
23     Q.   Can you describe what your initial reaction
24 was to hearing your son call for your help?



Page 78

1    A.    My initial reaction was, well, what was --
2  I was trying to figure out what was going on for him
3  to yell that way.
4    Q.    Did you immediately stop what you were
5  doing or take your time to get to the front door?
6    A.    I put down the pan of mac and cheese and I
7  went right to the front door.
8    Q.    About how far is the kitchen to the front
9  door?
10   A.    I'm not sure.  It's -- There's a dining
11 room in between, so the size of a room, figure
12 20 feet.
13   Q.    And approximately, how fast or quickly did
14 you go from the kitchen to the front door?
15   A.    It would just take seconds.
16   Q.    And why did you react so quickly?
17   A.    Because of the tone of my son's voice.
18   Q.    Detective Barsch, you testified that this
19 individual that came to your door said something to
20 the effect of I'll see you later or I'll catch you
21 later; is that correct?
22   A.    Correct.
23   Q.    Can you describe the tone that was used
24 when that statement was made?

Page 79

1    A.    It was made more of a -- It wasn't -- It
2  was more directed at me, I'll catch you later.  It was
3  more -- It seemed threatening, in a threatening way
4  even though the words were not threatening.
5    Q.    And as the statement was made, were you
6  making eye contact with this individual?
7    A.    When I came -- When I exited the front
8  door, he started to retreat down the staircase in the
9  front -- the driveway; and as I started to walk
10 forward, I actually took my eyes off of him to glance
11 right and left because the initial encounter was
12 extremely odd and I did at that point feel a little
13 apprehensive, so I looked both ways to see if there
14 was somebody in a bush or behind the side of my house.
15   Q.    And as this individual was retreating
16 towards his car, how long did it take him to get from
17 your front porch to the car?
18   A.    It was seconds.
19   Q.    Was there anyone in that bush or, sort of,
20 side area that you just described that you were
21 looking for?
22   A.    No.
23   Q.    Did you find it weird that he was asking
24 about a car being for sale?

Page 80

1    A.    Yes.
2    Q.    Why did you find that weird?
3    A.    The car was in between the two houses and
4  pushed all the way back in the driveway, you can't see
5  it from the street unless you're directly by the
6  house.
7    Q.    Detective Barsch, at the time, was your car
8  for sale?
9    A.    No, it was not.
10   Q.    Detective Barsch, did you author any
11 reports as it relates to this particular incident?
12   A.    No.
13   Q.    Did you decide what, if any, charges to
14 investigate further as it relates to Mr. Pitts and
15 this particular incident?
16   A.    No.
17   Q.    Did you decide whether or not the charge
18 that was investigated was classified as a felony or
19 misdemeanor?
20   A.    No.
21   Q.    And do you know for certain why
22 Detective Kenah was assigned by Sergeant Beck in this
23 matter?
24   A.    Personally, I do not.

Page 81

1    Q.    Detective Barsch, would you consider
2  yourself a victim in this case?
3    A.    Myself and my son.
4    Q.    And is it fair to say that you were not an
5  investigating detective as it relates to this
6  underlying incident, correct?
7    A.    That is correct.
8    Q.    Detective Barsch, how did this incident
9  make you feel?
10   A.    It made me scared for my family's life and
11 I was threatened.
12   Q.    And, Detective Barsch, you previously
13 testified that you did not have a surveillance camera
14 and/or video in place at the time but you do now; is
15 that correct?
16   A.    That is correct.
17   Q.    Have you changed anything about your life
18 or your home other than installing the alarm system as
19 a result of this incident?
20   A.    We've had to make adjustments to schedules
21 to make sure that none of the -- my youngest son is
22 not home by himself, one of the other two guys are
23 there.  We've notified neighbors that at certain times
24 in the day or afternoon that the kids might be home by



Page 82

1  themselves, so they check on them.  They also have
2  been given all the neighbors' phone numbers; and
3  access, they all have their own phones now to call 911
4  if something comes up at home.  And all the neighbors,
5  I believe, know about -- generally about someone
6  showing up at my front door that may have been trying
7  to get in the house and may have been trying to
8  threaten family and he may return.
9       Q.    One additional follow-up as it relates to
10  the criminal trial of Mr. Pitts.  When you were
11  testifying there, were you asked to make an in-court
12  identification of him?
13       A.    Yes.
14       Q.    And did you make that in-court
15  identification during his criminal trial?
16       A.    I did.
17       Q.    And then finally, Detective Barsch, as you
18  described yourself as being a victim in this matter,
19  to your knowledge, what is the status of this case
20  today?
21       A.    This case is still open.
22       Q.    And by "this case," do you mean the
23  underlying lawsuit or the underlying criminal
24  incident?

Page 83

1       A.    The criminal incident is still open and
2  undergoing.
3       MR. SHINE:  I have nothing further.
4       MR. FOX:  I just wanted to follow up on a couple
5  things that you just testified to.
6                 REDIRECT EXAMINATION
7  BY MR. FOX:
8       Q.    You said that yourself and your son was a
9  victim; is that right?
10       A.    Yes.  I feel that my son was a victim too.
11       Q.    And your son was a victim because he was
12  scared by this guy who was at the front door?
13       A.    Yes.
14       Q.    And among other things you -- it seemed
15  like he was scared because of the way he yelled for
16  you?
17       A.    That's correct.
18       Q.    And this was significant in your mind that
19  your son was scared of this whole event as well?
20       A.    Correct.
21       Q.    All right.  And it was to the point where
22  you -- he was scared to the point where you felt he
23  was a victim then, right?
24       A.    I felt he was victimized as well.

Page 84

1       Q.    Now, I want you to look at Exhibit 1 again.
2  This is the Original Case Incident Report.  Do you see
3  anything in the narrative -- and maybe I'm just
4  missing it, but do you see anything in the narrative
5  there about your son being scared or your son being
6  victimized or your son yelling to you as if it was
7  urgent, he was really scared of what was going on,
8  anything to that effect?
9       MR. SHINE:  I would object to speculation and
10  mischaracterizing prior testimony.
11       MR. FOX:  So actually I'm just having him read
12  the report, so there's nothing speculative about it;
13  so I'm just asking if anything is in there.
14       MS. CAMPBELL:  I'm objecting to him not authoring
15  the report.
16                 (Witness peruses document.)
17  BY THE WITNESS:
18       A.    No, I don't see anything in the narrative
19  that lists him as the victim.
20       Q.    Do -- In the reports, they always list
21  victims, right, who the victim is?
22       MR. SHINE:  Objection to speculation.
23  BY MR. FOX:
24       Q.    Well, let's look at this Original Case

Page 85

1  Incident Report on the first page.  It lists the
2  victim, do you see that?  In the second box down, it
3  says victim individual.
4       A.    It doesn't state that on my copy.
5       Q.    Okay.  Let me see what you're looking at.
6  If I could just -- If you look -- Do you see
7  "Occurrence Date," where the occurrence date is in the
8  top box?
9       A.    Yes.
10       Q.    And then look right below that, it says
11  victim individual.
12       A.    It doesn't state on my copy.
13       MS. DORY:  I think our printer may have --
14       MR. SHINE:  The printer may have deleted it out.
15  BY MR. FOX:
16       Q.    Okay.  Let me show you my copy here.
17                 (Document tendered.)
18  BY MR. FOX:
19       Q.    I'm talking about right there.
20       A.    Okay,
21       Q.    It lists the victim, correct?
22       A.    Correct.
23       Q.    And your son is not there, is he?
24       A.    No.



Page 86

1    Q.    And there's nothing in that report that
2 even references your son, is there?
3    MR. SHINE:  Objection to speculation as well as
4 inconsistent with the document that is being
5 presented.
6 BY THE WITNESS:
7    A.    It does.
8    Q.    As a witness?
9    A.    Yes.
10    Q.    But nothing about him being a victim, is
11 there?
12    A.    No.
13    Q.    And there's no indication anywhere in that
14 report that he was scared of anything, is there?
15    A.    Nothing in this report.
16    MR. FOX:  I have nothing further.
17    MS. DORY:  Andrea, do you have anything?
18    MS. CAMPBELL:  No questions from the City.
19    MR. SHINE:  There's nothing further.
20    MR. FOX:  You guys going to reserve?
21    MR. SHINE:  We'll reserve.
22            (Witness excused.)
23
24

Page 87

1        IN THE UNITED STATES DISTRICT COURT
         NORTHERN DISTRICT OF ILLINOIS
2             EASTERN DIVISION
3 JOKIM PITTS,                  )
                               )
4           Plaintiff,         )
                               )
5     -vs-                     )   No. 2019 C 7575
                               )
6 CITY OF CHICAGO DETECTIVE,    )
  H. BARSCH, UNKNOWN AND        )
7 UNNAMED CITY OF CHICAGO        )
  POLICE OFFICERS, and THE CITY )
8 OF CHICAGO,                    )
                               )
9           Defendants.        )
10
11        I, HENRY BARSCH, state that I have read the
12 foregoing transcript of the testimony given by me at
13 my deposition on the 22nd day of July, 2020, and that
14 said transcript constitutes a true and correct record
15 of the testimony given by me at the said deposition
16 except as I have so indicated on the errata sheets
17 provided herein.
18        _____
                HENRY BARSCH
19 No corrections (Please initial)_____
   Number of errata sheets
20 submitted_____(pgs.)
21 SUBSCRIBED AND SWORN to
   before me this _____ day
22 of _____, 2020.
23
24        _____
                NOTARY PUBLIC

Page 88

1 UNITED STATES OF AMERICA      )
  NORTHERN DISTRICT OF ILLINOIS )
2 EASTERN DIVISION              )   SS.
3 STATE OF ILLINOIS             )
  COUNTY OF COOK                )
4
5
6        I, Lisa M. Walas, Certified Shorthand
7 Reporter, do hereby certify that HENRY BARSCH was
8 first duly sworn by me to testify to the whole truth
9 and that the above deposition was reported
10 stenographically by me and reduced to typewriting
11 under my personal direction.
12        I further certify that the said deposition
13 was taken at the time and place specified and that the
14 taking of said deposition commenced on the 22nd day of
15 July, A.D., 2020, at 1:15 p.m.
16        I further certify that I am not a relative
17 or employee or attorney or counsel of any of the
18 parties, nor a relative or employee of such attorney
19 or counsel nor financially interested directly or
20 indirectly in this action.
21
22
23
24

Page 89

1        In witness whereof, I have hereunto set my
2 hand this 18th day of September, A.D., 2020.
3
4
5
6        LISA M. WALAS, CSR
7        180 North LaSalle Street
         Suite 2800
8        Chicago, Illinois  60601
         Phone:  (312) 236-6936
9 CSR No. 084-3787
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



```
                                              Page 90
 1   Errata Sheet

 2

 3   NAME OF CASE: Pitts vs City of Chicago

 4   DATE OF DEPOSITION: 07/22/2020

 5   NAME OF WITNESS: Henry Barsch

 6

 7   Page _____ Line _____ Reason _____

 8   From _____ to _____

 9   Page _____ Line _____ Reason _____

10   From _____ to _____

11   Page _____ Line _____ Reason _____

12   From _____ to _____

13   Page _____ Line _____ Reason _____

14   From _____ to _____

15   Page _____ Line _____ Reason _____

16   From _____ to _____

17   Page _____ Line _____ Reason _____

18   From _____ to _____

19   Page _____ Line _____ Reason _____

20   From _____ to _____

21   Page _____ Line _____ Reason _____

22   From _____ to _____

23

24   _____

     SIGNATURE OF DEPONENT
```





312.236.6936
877.653.6736
Fax 312.236.6968
www.lexitaslegal.com




312.236.6936
877.653.6736
Fax 312.236.6968
www.lexitaslegal.com





312.236.6936
877.653.6736
Fax 312.236.6968
www.lexitaslegal.com









312.236.6936
877.653.6736
Fax 312.236.6968
www.lexitaslegal.com





312.236.6936
877.653.6736
Fax 312.236.6968
www.lexitaslegal.com









312.236.6936
877.653.6736
Fax 312.236.6968
www.lexitaslegal.com





