**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOKIM PITTS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-4573 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| CITY OF CHICAGO DETECTIVE H. | ) | |
| BARSCH, UNKNOWN AND | ) | |
| UNNAMED CITY OF CHICAGO | ) | |
| POLICE OFFICERS, and the CITY OF | ) | |
| CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

In 2019, Chicago Police Detective Henry Barsch was at home when a man knocked on his door. Barsch's son answered and beckoned Barsch to the door. The man asked Barsch whether his car was for sale, and when Barsch informed the man that it was not, the man responded, "I'll catch you later" or "I'll see you later," before returning to his car and leaving. At the heart of this case, Barsch thought he recognized the man at his door and claims to have felt threatened by the encounter. The officer suspected the man was Plaintiff Jokim Pitts, the perpetrator of an armed robbery in which Barsch intervened fifteen years earlier. Barsch thus headed back to work, where he tried to glean more information about Pitts and later reported the incident. Several other Chicago Police Officers (CPD) officers investigated, which ultimately led to Pitts's arrest and detention. After further investigation—including of Pitts's alibi—CPD released Pitts from detention and dropped the charges. This lawsuit followed.

In his amended federal complaint, Pitts brings two claims: (1) a 42 U.S.C. § 1983 claim for false arrest, in violation of his federal Fourth Amendment rights, and (2) a state-law claim for false

imprisonment under Illinois law.  Pitts names Barsch, unknown and unnamed CPD officers, and the City of Chicago.

Now before this Court is the Defendants' motion for summary judgment on those two claims.  The record indicates that other CPD officers, not Barsch, decided to press forward on Barsch's report of the incident.  However, contrary to Pitts's assertions, there is no evidence from which to infer that *Barsch* filed a false report, made the decision to proceed on the arrest, selected the charges, or executed the arrest.  The undisputed material facts instead show that Barsch did not act under color of law, as required for his false arrest § 1983 claim.  Accordingly, summary judgment is proper on this claim.  Having dismissed the only basis for original jurisdiction in this case, the Court declines to exercise jurisdiction over Barsch's state-law false imprisonment claim.

While the Court regrets Pitts's experience and agrees that the CPD officers's swift decision to detain Pitts—without further investigation—appears hasty in hindsight, federal and state law do not afford Pitts a remedy for those officers' conduct, as they are not named as defendants in Pitts's federal lawsuit.[1]  Accordingly, the Court grants Defendants' motion for summary judgment [111] on his federal-law claim and dismisses the state-law claim without prejudice.  A final judgment consistent with Federal Rule of Civil Procedure 58 will enter in favor of Defendants and against Plaintiff and this civil case will be terminated.

---

[1] Although Pitts included "unnamed City of Chicago police officers" in the caption of his original complaint and in his subsequently filed amended complaint [72], he has never identified or sued any officers other than Defendant Barsch.  He also concedes that he "is not pursuing claims under the Fourteenth Amendment or against any unknown and unnamed Defendants."  [124 (Pl.'s Br. in Opposition to Defs.' Mot. for Summ. J. ("Pl. Opp. Br.")) at 15.]

## I.      Background

As noted above, an armed robbery that took place in 2004 sets the stage for the incident that led to Pitts's arrest in 2019.  The Court will thus briefly explain the 2004 crime before turning to the events of 2019.

### A.      2004 Armed Robbery

In 2004, Henry Barsch intervened in an armed robbery committed by Jokim Pitts. According to his deposition in the instant case, Barsch was off duty, driving to work when he observed a man pull on a woman's purse with a gun pointed at her head.  [113 (Defs.' Joint Local Rule 56.1(a)(3) Statement of Undisputed Material Facts in Support of their Mot. for Summ. J. ("Defs. SOF")) at ¶ 6; 113-1 (Ex. A, Barsch Dep.) at 10:17–11:8.]  According to Pitts, Barsch ordered a man (who turned out to be Jokim Pitts) to drop his weapon.  [113 at ¶ 7; 113-2 (Ex. B, Pitts Dep.) at 96:8.]  Pitts further stated that when Barsch intervened, Barsch was off-duty, driving a Cadillac, and did not identify himself as a police officer.  [125 (Pl.'s Resps. to Defs.' Rule 56.1 Statement of Facts ("Pls. Resp. to Defs. SOF")) at 3, ¶ 8; 126-2 (Pl. Ex. B, Pitts Dep.) at 96:13–24.]  Nevertheless, after Pitts told Barsch to drop *his* gun, Barsch shot Pitts.  [113 at ¶ 10; 113-1 at 11:19–22; 98-15:19.]  Pitts was then arrested.  Barsch testified at Pitts's jury trial, including making an in-court identification of Pitts.  [113 at ¶¶ 11–13; 13:21–14:4; 82:9–16.]  The jury convicted Pitts of armed robbery and the judge sentenced him to more than two decades in prison. [125 at ¶ 14.]  However, he was released from prison on parole in 2015.  [*Id.* at ¶ 15.]

### B.      2019 Incident and Arrest

Having provided background on the history between Barsch and Pitts, the Court fast-forwards fifteen years to March 2019 and the events giving rise to the instant case and motion.  To begin, the Court elaborates on the exchange between Barsch and the man at his door.  The Court

will then turn to Barsch's investigation and report of the incident at the police station and finally to the steps taken by other CPD officers steps to investigate, arrest, and release Pitts.

### 1.    Incident at Barsch's Home

On March 13, 2019, Barsch was on duty for the CPD and at home for a meal break.  [113 (Defs. SOF) at ¶ 4; 113-1 (Barsch Dep.) at 31:4–23.]  His two sons were also home.  [113 at ¶ 18; 113-1 at 6, 21:15–24.]  Although Barsch could not pinpoint the exact time, at some point in the late afternoon hours when it was still light outside, someone came to Barsch's door.  [*Id.* at 21:7–12, 22:9–11.]  The person knocked on the door, and Barsch's eleven-year-old son answered.  [113 at ¶ 18; 113-1 at 22:12–16.]  Barsch's son yelled for Barsch, asking him to come to the front door.  [113 at ¶¶ 19–20; 113-1 at 23:11–16.]

Barsch testified that when he arrived at the door, he asked the man if he could help him, and the man "asked me [Barsch] if I wanted to sell my car."  [113 (Defs. SOF) at ¶¶ 20, 22; 113-1 (Barsch Dep.) at 25:7–13.]  Barsch responded that the car was not for sale.  [113 at ¶ 23; 113-1 at 25:5–17.]  According to Barsch, the man "said I'll catch you later or I'll see you later, at which time he went back—hurried back to his car, jumped in the car and took off."  [113 at ¶¶ 24–25; 113-1 at 25:15–17.]  Although the man did not verbally say which car he was referring to, he "glanced over to where the car was in the back of [his] driveway," a 2001 Yukon parked at the rear end of his driveway.  [113-1 at 25:21–26:1.]  Barsch could not recall, but he did not believe his son was present during the exchange.  [113-1 at 25:18–20.]

Barsch maintains that he recognized the man as Jokim Pitts—the man who committed the 2004 armed robbery—and that he sensed a threat.  Specifically, as discussed in further detail below, Barsch stated that while speaking to the man, "it came to [Barsch's] head that that might be Mr. Pitts," *i.e.*, the person he shot and later helped convict in the 2004 robbery.  [113 (Defs.

4

SOF) at ¶ 26; 113-1 (Barsch Dep.) at 27: 3–19.][2]  The man "reminded [Barsch] of [Pitts] at the

time," and Barsch testified that "[t]o look at him, I thought this might be him [Pitts.]"  [113-1 at

27: 3–19.]  Although he acknowledged that the threat was not "overt," Barsch states that he felt

threatened by the encounter.

### 2.      Barsch's Follow Up and Complaint

Upon his return to work, Barsch searched for information about Pitts and would later

inform his supervisor about the incident.  Specifically, Barsch testified that when he arrived at

CPD, he ran an online search for Pitts.  According to Barsch, he checked the Illinois Department

of Corrections website to see if Pitts was released from prison, and the website indicated that

Plaintiff was no longer incarcerated.  [113 (Defs. SOF) at ¶¶ 30–31; 113-1 (Barsch Dep.) at 33:9–

19] (I first checked to see if the * * * Illinois Department of Corrections website to see if he was

out because I had no idea, at which they had him listed as discharged.)[3]  Barsch further testified

---

[2] Pitts disputes that Barsch "believed" the man at the door was Pitts but he has insufficient evidence to place the fact into dispute.  Namely, to "suggest[] Barsch is lying," he notes several facts: (1) that Barsch had not seen Pitts in fifteen years since the 2004 incident, and (2) there are discrepancies between Barsch's physical description of the man's hair as in cornrows, and that of a third party neighbor, who described the man as bald. [125 (Pl. Resp. to Defs. SOF) at ¶ 26; 126 (Pl.'s Local Rule 56.1 Statement of Additional Material Facts ("Pl. SOF")) at ¶¶ 13–14; 16; 35–36.]

Pitts has not marshaled any evidence in the record to call into dispute the veracity of Barsch's asserted belief.  Barsch's testimony is consistent with his testimony to other officers he spoke with before and during his report of the incident, including his discussion with other CPD Officers Donald Hill, [126-5 (Hill Dep.) at 17:15-24], Sergeant Robert Beck [113 at ¶ 35; 113-1 at 23–33:5], Detective Patrick Kenah [113 (Defs. SOF) at ¶ 41], and the searches he ran online for a single name after the incident, albeit with different spellings [113-1 (Barsch Dep.) at 33:24–34:19.]  It might be possible to show a dispute if, for example, Barsch testified inconsistently, or if other officers indicated Barsch gave different names or stories. But there is no evidence in the record that Barsch ever changed his tune.  Although the third party, a neighbor across the street, described the man in front of Barsch's home as being bald and there was a significant time lapse between the mens' encounters, at most those call into doubt the *accuracy* of Barsch's recollection of the incident or that he reached a snap judgment about the identity of the man.  Nevertheless, they do not make any headway in casting doubt on the *sincerity of Barsch's belief* that the man at the door was Pitts.

[3] Pitts disputes what steps, if any, Barsch took using publicly available data to identify Pitts.  As to the IDOC website, Pitts challenges whether any information about him would have been on the IDOC website:

that he ran Mr. Pitts's name through a Google search on a work computer, and that his search

returned a picture of someone "name[d] Jokim or Jokim or an abbreviation of that, last name Pitts.

It was himself in a leather jacket with a female."[4]  [113-1 at 33:24–34:19.]  He stated that the

photograph resembled the man on his porch.  [*Id.* at 34:24–35:6.]  Although he did not pinpoint

the timing of the search, he testified that he had looked at the photograph on the computer screen

by the time he approached Sergeant Beck.  [*Id.* at 37:12–23.]

      Critical to the motion now before this Court, Pitts and his partner gathered additional

information about Pitts using resources unavailable to a public citizen.[5]  Barsch ran Pitts's arrest

history and RAP sheet using the Chicago Police Department databases.  [126 (Pl.'s Local Rule

56.1 Statement of Additional Material Facts ("Pl. SOF")) at ¶ 3; 113-4 (Kenah Dep.) at 17:23–

---

Pitts's parole ended in 2018, so Pitts asserts that the information about his incarceration would no longer appear on the IDOC's website on the date of the incident, in March 2019.  [125 (Pl. Resp. to Defs. SOF) at ¶¶ 30–31; 126-2 (Pitts Dep.) at 98:1–14.]  But the absence of Pitts's information on the IDOC website would convey that Pitts was "listed as discharged" from IDOC custody.  In any event, this dispute of fact is not material to determining whether Barsch acted under color of law nor is it sufficient to cast doubt on the veracity of his complaint filed with Sergeant Beck and Detective Kenah.

[4] Specifically, Barsch testified "the picture is what drew my attention to it because that was the picture – it looks like the person who was on my porch."  [113-1 at 34:24–35:6.]  Pitts challenges the existence of the photo.  [125 (Pl. Resp. to Defs. SOF) at ¶¶ 32–33.]  To attempt to create a dispute, Pitts states that there was no photo in the investigative file, and if any photo existed, it would have been saved.  [*Id.*]  However, the absence of the *physical* photo from the file does not call into question whether Barsch searched for and returned an *electronic* photo of Pitts on his CPD computer.  To be sure, Barsch did testify that the photo was printed.  [113-1 (Barsch Dep.) at 35:7–35:24.]  But the absence of the photo is consistent with the other evidence in the record: Barsch testified that he had not printed the photo when he approached Beck.  [113-1 at 37:12–23.]  Kenah testified that Barsch showed him a Facebook photo but that he did not keep a photo for his report or records.  [113-4 (Kenah Dep.) at 6, 18:11–22.]  And another detective, Detective Cikulin, performed a search for the photo and testified to the best of his knowledge no photo exists in the investigative file.  [126-11 (Cikulin Affidavit).]

      In any event, the Google search is not dispositive to this Court's ruling.  To the extent it is relevant to Barsch's § 1983 claim, for the reasons discussed below, Barsch's alleged "investigation," whether or not it entailed a Google search, did not amount to a misuse of state authority and thus fails under the principles announced by the Seventh Circuit.

[5] "CPD databases can only be accessed from the police station and to gain access an officer has to sign-in using their unique PC number and passcode."  [126 (Pl. SOF) at ¶ 4; 132 (Defs. Resp. to Pl. SOF) at ¶ 4] (admitting this fact.)

18:3] (Kenah testified that Barsch "searched Facebook and found the person's picture and I believe he said he went into work and looked and it was the same person – looked on CPD databases. It was the same person that he had the encounter with in 2004 and it clicked in his mind").[6]  Beyond the alleged Google search, the alleged IDOC search, and Barsch's alleged use of the CPD database to pull Pitts's RAP and arrest history, however, Pitts has introduced no evidence in the record from which to infer that Barsch undertook any other "investigatory work" to ascertain the identity of the man at his residence.  See [126 (Pl. SOF) at ¶ 7.][7]

Pitts also points out that Barsch's partner, Detective Hill, searched police databases, including for Pitts's arrestee history and RAP sheet at 10:27 pm, and also searched for Pitts on multiple other databases, including the CLEAR system, Data Warehouse, and IDOC, using his police credentials.  [125 (Pl. Resp. to Defs. SOF) at ¶¶ 30–31; 132 (Defs' Reply to Pl.'s Local Rule

---

[6] Although Defendants contend that Kenah's testimony is inadmissible because he lacks personal knowledge that Barsch ran the search, personnel records indicate Barsch used the CPD database to search Pitts's arrest history and RAP sheet at 5:42 and 5:43 pm on March 13, 2019.  [126 at ¶ 4; Ex. H; CPD Personnel who accessed IR number 130959.]  Defendants dispute that there is a foundation for Exhibit H and thus it should be disregarded. [132 (Defs. Resp. to Pl. SOF) at pg. 7, ¶ 3.]  The Court reserves ruling but notes that it highly doubts that Pitts could not find a witness to lay an adequate foundation for Exhibit H.

[7] Pitts has introduced no evidence in the record to show Barsch performed any other "investigation" beyond the conduct described above.  Although Pitts cites Defendants' interrogatory responses, those responses provide no such support.  See [132 (Defs. Resp. to Pl. SOF) at pg. 10–11, ¶ 7] (he responded solely that "after speaking with his partner, he Googled the Plaintiff's name, but did not have the correct spelling of the name. The search results did produce a photo that Defendant believed was publically (sic) posted on Facebook of someone he believed he recognized as the male that came to his house.")

Barsch further testified in deposition that he did not "author any reports as it relates to this particular incident," did not "decide what, if any charges to investigate further as it relates to Mr. Pitts and this particular incident," did not "decide whether or not the charge that was investigated was classified as a felony or misdemeanor" and does not "know for certain why Detective Kenah was assigned."  [132 (Def. Resp. to Pl. SOF) at 11, ¶ 6; 113-1 (Barsch Dep.) at 80:10-24.]  Kenah confirmed that Detective Kenah (not Barsch) was assigned as an assistant detective to the investigation; and that later Detective Gillerlain was assigned as the "actual, like, stalking investigation" lead detective.  See [132 at ¶¶ 11–12, ¶ 6; 113-4 (Kenah Dep.) at 14:5–8; 49:14–50:4; 90:10-18;]  Beck likewise testified that he "assigned Detective Kenah to do the investigation."  [113-3 (Beck Dep.) at 15:17–18.]

56.1 Statement of Additional Material Facts ("Defs. Resp. to Pl. SOF")) at 9–10, ¶ 6) (admitting these facts except to the extent Exhibit H lacks foundation.) Although Pitts alleges that "Defendant Barsch had his partner, Detective Hill, search the IDOC databases," the sources he cites to do not support that proposition. Detective Hill did not testify that Barsch "had his partner" perform the search.[8]

### 3. CPD Investigation and Arrest

Barsch ultimately elevated the incident when he spoke to another CPD officer, Sergeant Beck, about the encounter at his home. When Beck asked him to describe the circumstances, [113 (Defs. SOF) at 34–35; 113-1 (Barsch Dep.) at 32:4–21; 113-3 (Ex. C, Beck Dep.) at 11:13–12:7], Barsch described what happened and that he believed or thought the man at the door could be Pitts. [113-1 at 32: 23–33:5; 11:13–12:7.][9] Barsch acknowledges that he did *not* "indicate to him [Beck] that the person at your [Barsch's] front door had threatened [him] in any fashion." [113-1 at 39:24–40:1.] In fact, he said "No. That's why we didn't make an assault." [113-1 at 39:24–40:1.]

Beck then assigned Detective Patrick Kenah to the incident. Sergeant Beck, whose responsibility it was to make detective assignments, [113 (Defs. SOF) at ¶ 37; 113-3 (Beck Dep.) at 7:14–22], testified that he "assigned Detective Patrick Kenah to do the investigation." [*id.* at 15:15–22.] Kenah likewise testified that Beck "asked me [Kenah] to write a police report" and further that Beck summarized his conversation with Barsch. [113-4 (Ex. D, Kenah Dep.) at 14:5–17.] Specifically, Kenah testified that Beck told him "an individual had knocked on Detective

---

[8] Hill's testified that Pitts told him about the incident, after which Hill "ran the guy's name through the CPD data warehouse" and advised Barsch to go report to the sergeant what happened. When asked why he ran Pitts's name, Hill testified "I name checked to see if he was still in custody or prison * * * * Because he's my partner and I was sitting at my desk." [126-5 (Hill Dep.) at 19:7-24.] When asked why he ran multiple searches, Hill testified that, "to obtain if Pitts was still in custody." [*Id.* at 39:23–14.] At most, Hill testified that he got Pitts's name from Barsch.

[9] Again, Pitts disputes whether that was Barsch's genuine belief. [125 (Pl. Resp. to Defs. SOF) at ¶ 35.]

Barsch's door and his young son had answered. And this person had made a threat to Detective Barsch and it was later deemed somebody that Detective Barsch had had an encounter with years before," and Kenah could not recall whether or not Beck identified the individual they suspected it was. [113-4 (Kenah Dep) at 14:21–15:11.]

Kenah then interviewed Barsch about his complaint on the evening of March 13, 2019. [113-4 (Kenah Dep.) at 15:12–16.] Detective Hill was also present for the interview. [*Id.* at 15:20–23.] The interview covered a range of territory, from Barsch's description and perception of the exchange with the man at his door, to Barsch's description of the man involved and his vehicle. As for the incident, Kenah testified that Barsch:

> said that he was home. His-he heard a doorbell ring. His young son answered the door and there was a male standing at the door and this person asked for a parent, so the—his son yelled for his father. Henry came to the door and the individual male black asked about a car that was parked in the driveway, if it was for sale or not, and Henry said it wasn't for sale. And Henry said that the – when the person was leaving, he looked at Henry and he said, Well, I'll see you later. And he said it in such a way that Henry took it to be a threat.

[*Id.* at 16:13–17:4.]

Barsch also relayed his state of mind during the exchange to Kenah. According to Kenah, Barsch did not say the man at the door made an "overt threat." [132 (Defs. Resp. to Pl. SOF) at ¶ 1; 113-4 (Kenah Dep.) at 54:9–13.] Nevertheless, when asked, Kenah agreed that "Barsch told [him] that he only – he sensed a threat." [132 at ¶ 1; 113-4 at 54:9–16.] Furthermore, when asked "did Detective Barsch tell you that the offender threatened him at any point," Kenah answered "Yes. He –The—Pitts had made a threat" and that the threat was, "I'll see you later." [113-4 at 21:1–21:5.][10]

---

[10] The Court is not persuaded that Pitts has introduced sufficient evidence to demonstrate a genuine dispute of fact over whether Barsch *subjectively* felt threatened at the time of the exchange. See [125; 126 (Pl. SOF) at ¶ 1] (disputing Barsch's testimony and asserting that "n[o one] else, threatened Defendant Barsch.") Barsch conceded that while "there was no direct *verbal* threat," [132 (Defs. Resp. to Pl. SOF) at ¶ 1; 113-1

Regarding the individual's physical characteristics, Kenah obtained a description from Barsch, which he documented in his original report. Relevant here, Kenah described Pitts as having short hair in the Original Case Incident Report. [125 (Pl. Resp. to Def. SOF) at ¶ 8; 113-4 (Kenah Dep.) at ¶ 51:3–8.][11] Kenah also testified that Barsch was familiar with the man at his door:

> He said that he knew that he had seen this person before and I believe he found him on Facebook. He searched Facebook and found the person's picture and I believe he said he went into work and looked and it was the same person – looked on CPD databases. It was the same person that he had the encounter with in 2004 and it clicked in his mind.

[113-4 at 17:16–18:3.] In his deposition for this case, Barsch later described the man as approximately 5'9 or 6 feet talk, "around mid 30s, lower 30s; my height, larger build;" with facial hair, "corn rolls [*sic*] in his hair, unkept; he was wearing a leather jacket, 8 ball leather jacket."

---

(Barsch Dep.) at 39:21–40:1] (emphasis added), he also described the man's "tone that was used when the statement" "I'll see you or I'll catch you later" "was made more of a – It wasn't – It was more directed at me, I'll catch you later. It was more – It seemed threatening, in a threatening way even though the words were not threatening." [132 at ¶ 1; 113-1 at 78:18–79:4.] He added, "It made me scared for my family's life and I was threatened." [113-1 at 81:10–11.] Rather, all this Court has is the testimony of Barsch, made consistently to Hill, Beck, and Kenah, that a man showed up to his personal home, where his kids were present, and asked about whether his car was for sale with no reason to think the car was for sale, and consistently testified in this case and in his conversation with Kenah that he felt threatened, [113-4 (Kenah Dep) at 14:21–15:11,] and informed Beck that the man was "suspicious." [113-3 (Beck) at 16:1–6.]

   While Pitts (perhaps fairly) takes issue with the *objective* reasonableness of Barsch's belief that the man at his door threatened him, he has not introduced a whisper of evidence that casts doubt on whether Barsch *subjectively* felt threatened. Perhaps the situation might be different if Pitts could offer evidence from other officers—such as his colleagues—indicating that Barsch inconsistently described the exchange or described him as cool and collected after the incident. No such evidence has been presented.

[11] While Pitts alleges that Kenah obtained this information "based on Barsch's statement" and the information on Pitts's RAP sheet, Defendants dispute that Barsch and Kenah discussed Pitts's hair. See [126 (Pl. SOF) at ¶ 8; 132 (Defs. Resp. to Pl. SOF) at pg. 12, ¶ 8]. Kenah testified that he did not recall whether he asked "Detective Barsch about the suspect's style of hair," but that it was his "practice to ask a victim the suspect's hairstyle" and that he had no "reason to believe that I would not ask him that? *** I- I don't know why I didn't ask him that or if I did." [113-4 (Kenah Dep.) at 51:13-52:15.] Pitts has the better of the argument on this point, as Defendants have not created any real doubt, given Kenah's testimony, Kenah's written report, and Kenah's general practices, to suggest that the two did not discuss the suspect's hair style.

[113 (Defs. SOF) at ¶¶ 20–21; 113-1 (Barsch Dep.) at 23:22-24:10.]  However, Barsch's neighbor also observed the encounter and testified that the man at Barsch's door was bald.  See [126 (Pl. SOF) at ¶ 13; 126-6 (Pl. Ex. F, Cleary Dep.) at 10:19–24.]

Kenah also took steps to verify the man's identity.  For example, Defendants maintain that Barsch showed Kenah a photograph on Facebook, though Kenah testified he did not keep a photo for his report or records.  [113-4 (Kenah Dep.) at 18:11–22.]  Kenah also showed Barsch Pitts's booking photograph, and Barsch confirmed the identity on the basis of the booking photo.  [113 (Defs. SOF) at ¶ 42; 113-4 at 19:1–14.][12]

Finally, Barsch also described the suspect's car to Kenah.  Detective Kenah testified that Barsch told him the individual was driving "a gray SUV" [113-4 (Kenah Dep.) at 19:15–19,] but did not identify the make and model,  [*id.* at 19:20–23.]  Kenah testified the two "deduced" that the model of the car was a Mercury by Kenah "show[ing] him [Barsch]—I would pull up pictures of SUVs."  [*Id.* at 19:20–20:11.][13]

---

[12] Pitts disputes that Kenah showed Barsch the booking photo because Kenah did not document this step in Kenah's original case incident report, and Barsch did not "corroborate that this occurred" in his testimony. [125 (Pl. Resp. to Defs. SOF) at ¶¶ 42.]  Nevertheless, that is not enough to create a genuine dispute.  Kenah testified as follows:

> [Q]: And did you show Detective Barsch any pictures to confirm the identity of the suspect? [Kenah]: I did. Q: And what pictures did you show him? [Kenah]: It was a booking photo. Mr. Pitts's booking photo. * * * * Q: And did Detective Barsch confirm the identity based on that booking photo? [Kenah]: Yes.

[113-4 (Kenah Dep.) at 19:1–14.]

The omission of a fact from Kenah's report, without more, is not sufficient to create a genuine dispute that the interview unfolded this way, as every summary necessarily requires decisions about what to include or exclude.  It is not clear to this Court how the absence of the photo verification process helps Pitts's position in any event.

[13] It appears that Pitts disputes "Barsch's description of the car," including whether Barsch identified the model of the car, what the car color was, and whether Kenah showed Barsch photos of various SUVs.  [125 (Pl. Resp. to Defs. SOF) at ¶¶ 44–45.]  The disputes are based on the fact that (1) showing Barsch the photos isn't in Kenah's Original Case Report, and (2) Barsch's own testimony "conflicts on whether or not he

Aside from interviewing Barsch, Kenah took several other steps to gather information about Pitts. Kenah used the Chicago Police Department CLEAR computer system to obtain information about Plaintiff. [113 (Defs. SOF) at ¶ 48; 113-4 (Kenah Dep.) at 25:10–17.] Kenah also accessed Pitts's driver's license information to obtain his current address. [113 at ¶ 47; 113-4 at 24:24–25:5.] He further reviewed the police reports from the 2004 incident between Pitts and

---

identified the offender's vehicle as a gray Mercury" as he testified "he was unable to identify the model of the car." [*Id*.]

Neither argument is persuasive. Pitts's assertion that Barsch testified he was "unable" to identify the car, [125 (Pl. Resp. to Defs. SOF) at ¶ 44], is not supported by the record. When asked if the Original Case Report "refresh[ed] [his] recollection that [he] described the vehicle as a dark gray Mercury SUV[,]" Barsch did not testify that he could not "identify" the model of the car; he testified that what he was "unable" to do was to recall "exactly the describers [he] used." [113-1 (Barsch Dep.) at 44:9–12.] "Did I describe a dark Mercury or maybe I didn't use the word Mercury, I don't recall. I don't know. I don't exactly know exactly what words I used. Now what I remember as of today is it's either gray or silver SUV." [*Id.* at 46:19–24.] Not being able to identify is not the same as not recalling "exactly what words [he, Barsch] used" when relaying the incident to Kenah. To be sure, Barsch testified that he is not good at differentiating between models ("I'm not the best with cars * * * * I couldn't really tell you if it was a –a certain model on some of the cars, the SUVs. So if it said Mercury or if it said another car, I don't know what, it really— I don't know.") [*Id.* at 45:1–14.] When asked if he believed Kenah's description in his report that Barsch "described the vehicle as a dark gray Mercury SUV," Barsch stated that he doesn't "believe that's a mistake, that he [Kenah] made a mistake in putting down a gray Mercury." [*Id.* at 44:15–21.] Furthermore, the so-called "conflict" between Barsch describing the vehicle, in general, as an SUV and then later specifying that it was a Mercury is not necessarily a dispute. Perhaps the situation might be different if Barsch had first described the car as a sedan and switched his story to report an SUV, but there is no such allegation or evidence to support it.

Nor is the car color enough to create a dispute of fact. Barsch stated in his deposition that he did not know the make and model of the man's car but described it as a "silver-gray SUV." [113-1 (Barsch Dep.) at 28:9–14.] Kenah testified similarly. [113-4 (Kenah Dep.) at 19:15–19.] ("[D]id Detective Barsch provide a description of the vehicle involved? A: He did. Q: And do you recall what the description was? A: A gray SUV.") Again, the differences are too subtle to create a dispute, whereas there might be some doubt if he had described it as green but reversed course to describe the car as red. In other words, the colors he named and the models are so similar that, just like Pitts's hair color, the minor discrepancies do not shed light on the *veracity* of Barsch's belief and whether he *fabricated* his story to other CPD officials, but rather on *his ability to perceive and then recall* the details of the incident.

Finally, the fact that Kenah did not record that he showed Barsch photos in the Original Case Report is not enough to create a dispute of fact for the same reason that this Court rejected Pitts's argument that the Kenah omitted from his report that he showed Barsch Pitts's booking photo. Any report necessarily entails judgments about what to leave in and out.

Defendant Barsch. [113 at ¶ 49; 113-4 at 91:2-17 92:7-20.] Finally, he also completed a case report about the incident. [113 at ¶ 50; 113-4 at 21:11-12, 87:4-8, 90:4-9, 93:23-94:1.]

Kenah testified that he next "submitted an investigative alert, probable cause for the arrest of Mr. Pitts," which, when asked how he decided to issue the alert, he explained it was "[b]ecause he [Pitts] was positively identified by Detective Barsch." [113-4 (Kenah Dep.) at 21:16–22.] According to Kenah, he "ma[de] that decision on [his] own." [*Id.* at 21:23–24]. He did, however, consult with Sergeant Beck before issuing the alert. The two discussed "the facts of the case as conveyed by Detective Barsch and what I [Kenah] put into the general offence case report and the fact that I [Kenah] was going to—I [Kenah] believed that probable cause existed for Mr. Pitts's arrest that he incurred." [*Id.* at 22:1–9.]

The next morning, March 14, 2019, other CPD officers arrested Pitts. He was arrested on stalking charges, in violation of 720 ILCS 5/12-7.3-A-3-2, [126 (Pl. SOF) at ¶ 31,] outside of his home near a grey Mercury SUV owned by his wife. [125 (Pl. Resp. to Defs. SOF) at ¶ 56] (admitting fact.) Barsch did not play a role in selecting the charges.[14] Nor was Barsch involved

---

[14] Although Pitts asserts that "Barsch was involved in the decision to pursue stalking charges against Plaintiff," [126 (Pl. SOF) at ¶ 18,] Barsch's involvement in the decision to press charges is not supported by the evidence. The deposition testimony Pitts cites for this proposition [126-1 (Barsch Dep.) at 38:5–11; 39:21–40; Dep. Ex. 4 at No. 20] indicates that Barsch and Beck discussed ways "to document what had happened" and, though it is disputed that Beck suggested the type of charge, Barsch's *testimony* is that *Beck*, not *Barsch*, "suggested the best way sounds like we have to make out a stalking incident report." See [113-1 (Barsch Dep.) at 38:5–11.] ("Q: And what did Sergeant Beck say that he would do about it, if anything? A: After telling him the circumstances, that we talked about several ways to document what had happened and he said—he suggested the best way sounds like we have to make out a stalking incident report"). Furthermore, the fact that Barsch testified that he "suspected that Plaintiff may have violated" Illinois's stalking law does not identify what, if anything, he did to act on that suspicion. See [113-1 (Barsch Dep.) at Ex. 4 (Interrogs.) at No. 20.]

The best Barsch can muster is his testimony that "we didn't make an assault," [113-1 (Barsch Dep.) at 40:1,] but even the term "we" in reference to an *assault* charge that CPD *never* made is not sufficient to infer that Barsch was involved in the selection of the *stalking* charges that Kenah testified he included in the case report. See [132 (Defs. Resp. to Pl. SOF) at 22, ¶18; 113-4 (Kenah Dep.) at 87:4–9.] (Q: [W]ho decided to include in the case report the charge of stalking? A: That was my decision. It wasn't—It's not a charge in the case report, it's just for case reporting purposes.") To be sure, Beck testified that he did not

in or present at the arrest.  See [125 (Pl. Resp. to Defs. SOF) at 16, ¶ 72) (admitting fact to the extent that Barsch was not physically present when Pitts was arrested.)[15]

That same day, Plaintiff was interviewed at the police station by Detective Kenah and another CPD officer, Detective Todd Gillerlain.  [125 (Pl. Resp. to Defs. SOF) at ¶ 57; 113-4 (Kenah Dep.) at 29:17-30:6;] Kenah testified that Detective Gillerlain was assigned as the lead detective for the investigation.  [125 at ¶ 58; 113-4 at 90:10-18.]  During the interview, Pitts denied going to Defendant Barsch's home and told detectives he was at work at the time of the incident.  [125 at ¶ 59; 113-4 at 32:22–33:4.]

The plan to bring charges soon was dropped.  Detectives investigated Pitts's alibi by speaking with his employer, verifying that he was signed/clocked in at work at the time of the incident.  [125 (Pl. Resp. to Defs. SOF) at ¶ 60; 113-4 (Kenah Dep.) at 31:20-32:2, 34:19-21, 35:2-

---

tell Barsch what to do next or what type of charge to pursue.  See [125 (Pl. Resp. to Defs. SOF) at ¶ 36; 113-3 (Ex. C)] ("Do you recall telling Detective Barsch what type of charges he should pursue against the offender; [Beck]: No, ma'am. Q: Would it surprise you to learn that Detective Barsch said that it was your idea to pursue stalking charges? A: I have no knowledge of that, ma'am. Q: Did you tell Detective Barsch what he should do, what the next step should be because of this incident at his house on March 13, 2019; A: No, ma'am.")

Even if any of these statements revealed a genuine issue of fact in regard to whether Barsch had a role in selection of the type of charges, they do not affect this Court's conclusion that his alleged misconduct did not enable him to misuse his state authority.  Like the RAP sheet search, it is unclear what if anything concerning his alleged involvement in the selection of the charge constitutes a "misuse" of his authority as required to show he acted under color of law.  There is no genuine dispute that he sincerely believed the man at his door was Pitts and that he felt threatened.

[15] Plaintiff also denies Defendants' statement of facts—that Barsch was not "present" for the arrest—to the extent it insinuates that Barsch "did not direct Plaintiff to be arrested."  [125 (Pl. Resp. to Defs. SOF) at ¶ 72.] However, again Pitts has not put the issue into dispute, as he relies on his statement of additional facts 18 and 40 to support his view.  As to Plaintiff's statement of additional facts number 18, Pitts lacks evidence that Barsch was "involved in the decision to pursue stalking charges" for the reasons already discussed.  See also [132 (Defs. Resp. to Pl. SOF) at 21–22, ¶ 18.] As to his statement of additional facts, paragraph 40, "the incident at issue it was imperative that Plaintiff be arrested because the case was serious since it involved a detective" that does not undermine the factual statement that Barsch "did not direct Plaintiff to be arrested."

14

3; 113-5 (Ex. E, Deposition of Karen Pioli) at 51:2-17, 51:22-52:2.] Pitts was released without being charged.

This lawsuit followed. Pitts alleged that Barsch, the City of Chicago, and unknown and unnamed City of Chicago police officers violated his rights under federal and state law. The amended complaint [72] alleged a claim under 42 U.S.C. § 1983 for false arrest in violation of the Fourth Amendment, a second claim for false imprisonment in violation of Illinois state law, and a third claim for spoilation that has since been dismissed from the case.

Defendants now move for summary judgment on the two remaining claims in the case. [111 (Defs.' Mot. for Summ. J.), 112 (Defs.' Mem. in Support of their Mot. for Summ. J. ("Defs. MSJ Br.")), 131 (Defs.' Mem. in Support of their Mot. for Summ. J. ("Defs. MSJ Reply")).] Pitts opposes that motion in full. [124 (Pl.'s Br. in Opposition to Defs.' Mot. for Summ. J. ("Pl. Opp. Br."))] That motion is now before this Court.

## II. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "On a motion for summary judgment, the moving party has the burden of demonstrating that there are no genuine questions of material fact and that he is entitled to judgment as a matter of law." *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 (7th Cir. 1994). "Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials that 'set forth specific facts showing that there is a genuine issue for trial.'" *Harney v. Speedway*

*SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) (quoting Fed. R. Civ. P. 56(c)). As noted above, in evaluating a motion for summary judgment, the Court construes all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in favor of the nonmoving party. *Bell v. Taylor*, 827 F.3d 699, 704 (7th Cir. 2016).

## III.    Analysis

In their motion and corresponding brief in support [111, 112], Defendant Barsch and the City of Chicago request summary judgment on Pitts's false arrest and state law claims.

### A.    False Arrest Claim Against Barsch

To begin, Defendants argue that Pitts cannot proceed as a matter of law under § 1983 on his false arrest claim against Barsch because Barsch did not act under color of law, and, alternatively, Barsch was not personally involved in Pitts's detention. [112 (Defs. MSJ Br.) at 4 (color of law), 6 (personal involvement).] As a backstop, Defendants argue that probable cause bars Pitts's claim or, in the alternative, Barsch is entitled to qualified immunity. [*Id.* at 7 (probable cause), 11 (qualified immunity).] Pitts opposes all of these arguments, attempting to distinguish *Barnes v. City of Centralia*, 943 F.3d 826, 831 (7th Cir. 2019), by arguing that Barsch was not just a crime victim, but also an active participant in the investigation of the incident. [124 (Pl. Opp. Br.) at 4–7.] He further argues that Barsch lacked probable cause to have Pitts arrested and is not cloaked by immunity. See [124 at 7 (probable cause), 15 (immunity).] The Court agrees with Defendants' first two points and thus will not reach the argument that Pitts's claim is barred by probable cause or qualified immunity.

#### 1.    Color of Law

Defendants' primary argument is that the undisputed material facts show that Barsch was *not* acting under color of law when he reported Pitts for allegedly threatening him at his home and

thus Pitts cannot sustain a cause of action under § 1983. Rather, according to Defendants, Barsch was acting "in his private capacity as a crime victim." [112 (Defs. MSJ Br.) at 4.]

"A plaintiff may hold a public official personally liable for misconduct under § 1983 upon satisfying two 'essential elements.'" *DiDonato v. Panatera*, 24 F.4th 1156, 1159 (7th Cir. 2022) (citation omitted) (quoting *Yang v. Hardin*, 37 F.3d 282, 284 (7th Cir. 1994)). The first essential element, at issue here, is that "the challenged conduct must have been 'committed by a person acting under color of state law'—a requirement coming directly from § 1983's text." *Id.*

It is not a foregone conclusion that a defendant acted under color of law simply because he is a public official. *Barnes*, 943 F.3d at 831 ("Not every action by a state official or employee occurs under color of state law.") So, a defendant's "mere status as a policeman does not render all of his acts under color of state law." *Gibson v. City of Chicago*, 910 F.2d 1510, 1516 (7th Cir. 1990); *Plaats v. Barthelemy*, 641 F. App'x 624, 627 (7th Cir. 2016) ("Section 1983 does not cover disputes between private citizens, even if one happens to be an officer.") Rather, "[a] state officer's conduct does not constitute acting under color of state law unless it is 'related in some way to the performance of the duties of the state office.'" *Id.* (quoting *Wilson*, 624 F.3d at 392).

Assessing whether that performance is related to the performance of duties "is necessarily a rigorous fact-bound inquiry." *DiDonato*, 24 F.4th at 1160. "Deciding whether a police officer acted under color of state law should turn largely on the nature of the specific acts the police officer performed, rather than on merely whether he was actively assigned at the moment to the performance of police duties." *Pickrel v. City of Springfield*, 45 F.3d 1115, 1118 (7th Cir. 1995). See, *e.g.*, *Gibson*, 910 F.2d at 1517 ("[W]hether or not a police officer is off-duty does not resolve the question of whether he or she acted under color of state law" (quoting *Layne v. Sampley*, 627 F.2d 12, 13 (6th Cir. 1980)).

17

Further elaborating on this inquiry, the Seventh Circuit has observed that "[a]ction is taken under color of state law 'when it involves a misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Barnes*, 943 F.3d at 831 (quoting *Honaker v. Smith*, 256 F.3d 477, 484–85 (7th Cir. 2001)). Put another way,

> Where, on the other hand, a plaintiff does not allege that a public official's actions involved some inappropriate invocation or exercise of state authority, there is no § 1983 claim. And that is so, our cases demonstrate, even if the alleged conduct resembles job-related tasks the official performs at the state's behest.

*DiDonato*, 24 F.4th at 1160.

A pair of recent Seventh Circuit cases provide some guideposts about what it means to be "related" or to "involve[] a misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." In a strikingly similar case, *Barnes v. City of Centralia*, 943 F.3d 826 (7th Cir. 2019), a police officer filed a formal complaint against a citizen who had threatened him, and the citizen was placed under arrest. *Id.* at 829–30. After the charges were dropped, the citizen filed a section 1983 claim against the police officer. *Id.* at 830. Even though the defendant was "a police officer, and the interaction with [the plaintiff-citizen] which led to her arrest occurred during [the defendant's] employment," his conduct did not go beyond the pale of a private citizen. *Id.* at 831. "A different officer took [the defendant's] statement. [The defendant] did not arrest [the plaintiff] and had no role in her arrest. The investigating officer 'had sole discretion to decide whether to arrest [the citizen], and [the defendant] did not know if Barnes would be arrested." *Id.* The Seventh Circuit therefore concluded that the defendant-police officer was not acting under color of law because he "acted as a private citizen complaining about a purported crime, distinct and apart from his job as police officer." *Id.* "Report[ing] an alleged crime" is "a private act that d[oes] not involve any exercise

of state authority[;] * * * [l]aw enforcement officers, like all other citizens, may invoke the state's protection without rendering themselves liable under § 1983." *Id.*

*DiDonato v. Panatera*, 24 F.4th 1156 (7th Cir. 2022), which the Seventh Circuit issued after the parties briefed the instant motions, places a finer point on the relevant inquiry. There, the defendant provided inadequate care to and then sexually assaulted his houseguest after she was seriously injured from a fall at the defendant's home. *Id.* at 1158, 1159–60. The Court considered whether the man, who happened to be a state paramedic, acted under color of law. *Id.* In synthesizing several cases addressing whether a defendant acted under color of law for § 1983 purposes, the Seventh Circuit announced a "principle that resolv[ed]" the case before it: "To plead that a defendant acted under color of state law, a § 1983 plaintiff must allege that a defendant's invocation of state authority in one way or another facilitated or enabled the alleged misconduct." *Id.* at 1161.

As applied to the case before it, the court of appeals concluded that the plaintiff's allegations were insufficient to satisfy the color-of-law element when the paramedic provided medical care in the plaintiff's home and in the context of their personal relationship. *DiDonato*, 24 F.4th at 1161. It rejected the arguments that the defendant's conduct in treating her wounds "relate[d] to the duties he perform[ed] as a paramedic—no doubt he routinely treats * * * wounds while responding to 911 calls;" that the man was likely "more able to respond to [her] injuries than someone without medical training," and that he technically "was 'on call' as a paramedic'" at the time of the assault. *Id.* at 1161–62. Those allegations did not transform this "purely private social interaction" into state action because the complaint "lack[ed] any allegation that [the defendant's] alleged misconduct toward her was facilitated by a misuse of state power or involved an invocation of state authority." *Id.* at 1162. In other words:

the mere overlap between [the defendant's] routine job responsibilities and the conduct [the plaintiff] complained of does not mean that [the defendant] acted under color of state law when he decided not to take [the plaintiff] to the emergency room or to provide other medical help. What is missing from [the plaintiff's] complaint is any plausible allegation either that [the defendant's] action or inaction was a misuse of the City's power or that his wrongdoing was made possible because he was "clothed with the authority of state law."

*Id.* at 1161.

Shifting to the case before it, this Court agrees with Defendants that Barsch was not acting under color of law. The *Barnes* case nearly preordains this outcome. Just like the officer-defendant in *Barnes*, here Barsch's involvement in Pitts's arrest boils down to reporting the alleged crime: his "act as a private citizen complaining about a purported crime, [is] distinct and apart from his job as police officer." See 943 F.3d at 831.

In response, Pitts attempts to limit *Barnes*' application to this case because Barsch did not merely report a crime; he conducted an investigation into the identity of the offender "in pursuit of a suspect," which is a quintessential "police function." [124 (Pl. Opp. Br.) at 6, 7.] This argument is not persuasive for several reasons.

First, Pitts points out that Barsch conducted a search for Pitts's RAP and arrest sheet on a Chicago Police Department database,[16] a resource "only available to him in his authority of a police office" and accessible only using a unique PC number and passcode "to obtain confidential information about Plaintiff before reporting the incident" to his superiors. [24 (Pl. Opp. Br.) at 6.] The trouble is that he cannot explain how the purported invocation of state authority—using the CPD database—was either a "misuse" of the City's power or that any "wrongdoing was made possible because he was 'clothed with the authority of state law.'" See *DiDonato*, 24 F.4th at

---

[16] Personnel records indicate Barsch used the CPD database to search Pitts's arrest history and rap sheet at 5:42 and 5:43 pm on March 13, 2019. [126 (Pl. SOF) at ¶ 4; Ex. H; CPD Personnel who accessed IR number 130959.]

1161.  As Defendants point out, the undisputed record is that Barsch "suspected that the man on his porch was Plaintiff while he was speaking to him."  [131 (Defs. MSJ Reply) at 5.]  If anything, running the search is not a misuse of authority—instead, it is taking an extra precaution in an effort to confirm a suspicion before elevating it up the chain of command.

Nor did being clothed with the state's authority make his alleged "wrongdoing"—filing the complaint and naming Pitts in it—"possible."  See *DiDonato*, 24 F.4th at 1161.  It is difficult to see how running the search enabled or facilitated Barsch's filing of the report with Beck or with Kenah, the assistant detective with whom he interviewed.  To the contrary, Barsch thought he recognized Pitts at his doorstep, looked up his image on Google, and checked the IDOC website for his whereabouts.  Barsch could have made his complaint with or without running the CPD Database search, so it's difficult to see what role the search played at the margins.  At best, a factfinder could doubt Barsch's belief that the man at his door was Pitts, but even then what role would the search play?  Perhaps a factfinder could suspect Barsch was trying to make the story stronger by showing Pitts was no longer incarcerated before reporting the incident.  However, just as the Seventh Circuit rejected the idea that the defendant's training as a paramedic contributed to his wrongdoing, "the mere overlap between [Barsch's] routine job responsibilities," his job hunting down suspects, "the conduct [Pitts] complained of," and the RAP and arrest history search "does not mean that [Barsch] acted under color of state law when he decided" to file his complaint identifying Pitts.  See *DiDonato*, 24 F.4th at 1161.  In fact, Barsch did not need the search to make his story airtight: Barsch could have shown Pitts was no longer incarcerated by using IDOC's public website to show he was no longer in IDOC's population.

Second, Pitts's argument that Barsch investigated the case overstates the record to suggest that his involvement exceeded that of a private citizen complaint.  Barsch did not search the

21

database again between March 2019 and January 1, 2020. [131 (Defs. MSJ Reply) at 6.] Pitts offers several additional pieces of evidence from which to infer that Barsch performed an investigation beyond that, which do not alter this Court's view. For one, he argues that Barsch's partner, Detective Hill, searched the IDOC databases using his police credentials. [125 (Pl. Resp. to Defs. SOF) at ¶¶ 30–31.] However, there is no evidence that Barsch directed Hill to perform the search, and even then, the best this Court can ascertain is that Hill performed the search at 10:27 pm, after Barsch reported the incident.[1] Pitts also points out that "Barsch was on-duty at the time of the incident and worked three and half hours of overtime on the date of the incident," [124 (Pl. Opp. Br.) at 6,]; and that Kenah was not assigned to the incident until some five and a half hours after the incident, at 10:00 pm. [113-4 (Kenah Dep.) at 49:8-50:4.] His overtime hours and the delay are insufficient evidence from which to infer Barsch received overtime for investigating the suspect himself. Aside from running the two searches ten minutes after his shift ended at 5:30 pm, Pitts has not pointed to any evidence that Barsch spent the overtime period investigating the suspect. Specifically, Pitts points to no searches, no emails, no documents, not even testimony from his colleagues working the shift that would suggest that Barsch was hunting down the man at his door. Instead, the record shows only that Barsch (1) filed the complaint, (2) ran Pitts's arrest and RAP sheet just minutes after his shift ended, and then (3) participated in the interview with Kenah. The Court thus disagrees with Pitts's view that a "reasonable inference is that Defendant Barsch received overtime for his investigation into the identity of the offender." [124 (Pl. Opp. Br.) at 6.]

Nor is it an answer to say that Barsch was involved in the decision to press stalking charges. As noted above, in the statement of facts, Pitts provides no evidence to support his assertion: Kenah testified that he decided to issue the alert, and no testimony, declaration, or document is sufficient

to infer that Barsch played a role in selecting the stalking charge. At best, Plaintiff can point to one of two statements. The first, Barsch's testimony that "we" decided not to pursue the assault charge, is unavailing. [113-1 (Barsch Dep.) at 40:1.] The fact that Barsch was *not* involved in pursuing an assault charge against Pitts is not evidence that he was involved in deciding what crime(s) (*i.e.*, stalking) to *affirmatively* choose to include in the case report. The other statement— Barsch's testimony that Beck told him to file a stalking report, and Beck's testimony that he did not tell Barsch which charges to pursue—is no more persuasive. This conflict only suggests *Beck*, not *Barsch*, might have selected the charge. Even assuming *arguendo* those statements created a genuine dispute that Barsch was helping the officers decide what charges could be pursued and had the benefit of knowing the suspect's criminal history through CPD databases, that does not transform his conduct into a misuse of state authority. Just like the CPD database search, Pitts cannot show that eliminating a charge for which there was insufficient evidence made Barsch's conduct (filing a complaint as a private citizen) "possible" as there is no dispute Barsch sincerely believed the man at his door was Pitts and that he felt threatened. See *DiDonato*, 24 F.4th at 1161.

In sum, Barsch's "investigation"[17] and involvement boils down to two searches on a CPD database before running his concerns up the chain, which does not distinguish this case from

---

[17] As noted above, Pitts asserts in his statement of additional facts that Barsch performed an investigation, but has he introduced no other evidence in the record. Although Pitts cites the Defendants's interrogatory responses, those responses provide no such support. See [132 (Defs. Resp. to Pl. SOF) at pg. 10–11, ¶ 6] (he responded solely that "after speaking with his partner, he Googled the Plaintiff's name, but did not have the correct spelling of the name. The search results did produce a photo that Defendant believed was publically (sic) posted on Facebook of someone he believed he recognized as the male that came to his house."). In fact, Barsch further testified in deposition that he did not "author any reports as it relates to this particular incident," did not "decide what, if any charges to investigate further as it relates to Mr. Pitts and this particular incident," did not "decide whether or not the charge that was investigated was classified as a felony or misdemeanor" and does not "know for certain why Detective Kenah was assigned." [132 at 11, ¶ 6; 113-1 (Barsch Dep.) at 80:10-24.] Kenah and Beck confirmed that Detective Kenah was assigned to the investigation; and that Detective Gillerlain was assigned as the "actual, like, stalking investigation" lead detective. See [132 at 11–12, ¶ 6; 113-4 (Kenah Dep.) at 14:5–8; 49:14–50:4; 90:10-18.]

*Barnes.*  That is not enough to create a genuine dispute that he acted under color of law, and thus he cannot meet an "essential element" for his false arrest claim.  See *DiDonato*, 24 F.4th at 1159.  Accordingly, the Court grants judgment as a matter of law in favor of Barsch on Pitts's Fourth Amendment claim.

### 2.  Personal Involvement

Even if Barsch acted under color of law, Pitts's federal claim still fails because there is no evidence that Barsch was personally involved in Pitts's arrest.  The Court agrees that "Barsch did not arrest Plaintiff, nor did he direct any police officer to arrest Plaintiff."  [112 (Defs. MSJ Br.) at 7.][18]  There is no dispute that Pitts "was arrested by other Chicago Police officers after an investigation by other detectives."  [*Id.* at 7; 113 (Defs. SOF) at ¶¶ 56, 66, 70–72.]  Similarly, Barsch had no involvement whatsoever with Plaintiff's detention at the police station, interview, or with Pitts's release without charges being filed.  [113 at ¶¶ 56, 66, 70–72.]

That is not the end of the inquiry, however.  Although cited by neither party, the Seventh Circuit has held that "[a] police officer who files a false report may be liable for false arrest if the filing of the report leads to a seizure in violation of the Fourth Amendment, even if he did not conduct the arrest himself."  *Acevedo v. Canterbury*, 457 F.3d 721, 723 (7th Cir. 2006); see also *Stokes v. Bd. of Educ.*, 599 F.3d 617, 624 n.2 (7th Cir. 2010) ("We have held, by way of comparison, that a police officer may be liable for a constitutional false arrest claim by signing a false criminal complaint that led to the claimant's arrest").  See, *e.g.*, *Glickman v. Main-Niles Ass'n of Special Recreation*, 440 F. Supp. 3d 946, 958–59 (N.D. Ill. 2020) (plaintiff sufficiently plead

---

[18]  Defendants asserted in their Rule 56.1 Statement that "Barsch never directed or pressured any detectives to take any action in this matter."  [132 at ¶ 70.]  Although Pitts denies this statement, he does so on the basis that "Defendant Barsch was involved in the decision to pursue stalking charges against Plaintiff."  [125 (Pl. Resp. to Defs. SOF) at 16, ¶ 70.]  He has not introduced a genuine dispute.  The evidence he points to, [*id.*] (citing [113-1 (Barsch Deposition) at 38:5–11]), does not support the proposition.

personal involvement for § 1983 purposes because complaint alleged two camp counselors working for state signed a criminal complaint with falsehoods in it); *Lopez v. City of Chicago*, 2010 WL 4340406, at *2 (N.D. Ill. Oct. 26, 2010) ("The Fourth Amendment prohibits police officers from signing, creating, and authorizing false criminal complaints. * * * * Lopez's allegation that the officers misled Fouts into signing a false criminal complaint is a quintessential Fourth Amendment claim.")

In this case, there is no issue of fact to preclude finding that Barsch did *not* file a false complaint. Pitts introduces no evidence to cast doubt on Barsch's assertion that he genuinely believed the man at his door was Pitts and that he genuinely felt threatened by the encounter. The most Pitts can muster is to try to cast doubt on Barsch's description of Pitts's hairstyle and car, Barsch's testimony that he recognized Pitts, and Barsch's testimony that he felt threatened. As discussed in great detail in Part I, Pitts has not introduced any evidence to show a genuine dispute of fact as to whether Barsch believed the man was Pitts or that he subjectively felt threatened. All of the evidence Pitts homes in on—the contrasting description of Pitts's by Barsch's neighbor, Barsch's slight variations in describing the car—go to the accuracy of his description of the incident, rather than the authenticity of his beliefs about who the person was. What is left is Pitts's view that a reasonable person would not have felt threatened and acted on the exchange, not whether Barsch subjectively was put in fear. In sum, in stark contrast to the false description of what unfolded in *Acevedo*, there is no basis from which a trier of fact could conclude that Barsch filed a false complaint or report to CPD. Accordingly, the Court can determine as a matter of law that Barsch was not "personally involved" in the arrest for § 1983 purposes, and he is an inappropriate defendant for Pitts's false arrest claim.

### B. False Imprisonment Claim Against Barsch

With respect to Defendant Barsch, all that leaves is Pitts's false imprisonment claim. However, before wading into the merits, the Court must address its jurisdiction to reach this state-law claim. Section 1367 of Title 28 of the United States Code "lays out a framework by which courts may exercise supplemental jurisdiction over state law claims that share 'a common nucleus of operative facts' with a federal claim properly brought before the court." *Bailey v. City of Chicago*, 779 F.3d 689, 696 (7th Cir. 2015) (quoting *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 500 (7th Cir. 1999)). Here, the two claims are intertwined, as they both arise from Barsch's encounter with Pitts, his follow up at CPD, and his filing of the complaint against Pitts. How close the claims overlap, however, is debatable.

A district court may decline to exercise supplemental jurisdiction over a state-law claim if:

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). "The Supreme Court in *City of Chicago* [*v. International College of Surgeons*, 522 U.S. 156, 173 (1997),] counseled that a district court, in considering the factors set forth in § 1367(c), 'should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" *Groce*, 193 F.3d at 501 (quotation marks omitted). "That the jurisdictional hook is eliminated before trial at best only preliminarily informs the balance; the nature of the state law claims at issue, their ease of resolution, and the actual, and avoidable, expenditure of judicial resources can and should make

the difference in a particular case." *Hansen v. Bd. of Trs.*, 551 F.3d 599, 608 (7th Cir. 2008) (quoting *Timm v. Mead Corp.*, 32 F.3d 273, 277 (7th Cir.1994)). See *Donald v. Wexford Health Sources*, Inc., 982 F.3d 451, 461 (7th Cir. 2020) (retention of state-law claims may be appropriate "when it is absolutely clear how the pendent claims can be decided."). "So long as an 'arguable balance' of these factors favors the district court's determination to exercise jurisdiction, that decision should not be disturbed." *Hansen*, 551 F.3d at 608.

The Seventh Circuit's "case law makes clear" that a district court "d[oes] not automatically lose that jurisdiction once it grant[s] summary judgment on" the federal-law claim that warrants exercising its original jurisdiction. *Groce*, 193 F.3d at 500 & n.6. Nevertheless, it is the "presumption," *Al's Serv. Ctr. v. BP Prods. N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010), and "the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce*, 193 F.3d at 501. For example, retention of a strictly state-law claim may be an abuse of discretion "where important state policy goals may conflict." *Hagan v. Quinn*, 867 F.3d 816, 830 (7th Cir. 2017) (upholding relinquishment of state law claims). The jurisdictional statute allows, but "does not require," a district court to dismiss in the face of a complex or novel issue of state law. See, *e.g.*, *Bailey*, 779 F.3d at 696 (upholding retention of state law claims despite that district court addressed a novel question, whether actions by police towards persons in custody can form the basis of an IIED claim).

Neither party addressed whether the Court should relinquish jurisdiction over Pitts's state-law claim for false imprisonment, but that does not excuse a federal court from the obligation to consider its power to hear a case.

Turning to the case at hand, several factors favor dismissing the state law claim. This Circuit makes it the "usual practice" to dismiss without prejudice where, as here, "all federal claims have been dismissed prior to trial." See *Groce*, 193 F.3d at 501. Furthermore, the nature of the claims shows they are not too closely interrelated because each requires a different inquiry. Namely, the relevant inquiry under federal law to determine if Barsch was personally involved for § 1983 purposes is *did he file a false complaint*? See *Acevedo*, 457 F.3d at 723. Meanwhile, the inquiry under state-law to assess whether Barsch "caused or procured" the arrest is *did he encourage or direct the arrest*?[19]

Nor is the appropriate outcome in this case "absolutely clear." Pitts plausibly argues that Barsch caused the arrest because he is the sole source of the information leading to the arrest; however, Defendants also have a reasonable argument that Barsch neither "suggested or encouraged the arrest."[20] Compare *Donald*, 982 F.3d at 461 (affirming retention of claims where plaintiff's malpractice claim was doomed without any admissible expert testimony). This case also arguably involves important issues of state policy, *i.e.*, whether the Illinois courts would treat police-initiated complaints differently than those of private citizens under the "caused or procured" prong. See *Hagan*, 867 F.3d at 830 (upholding relinquishment of a strictly state-law claim with or without plaintiff's waiver because retention might have been an abuse of discretion "where important state policy goals may conflict.")

---

[19] See *Gaddis v. DeMattei*, 30 F.4th 633 (7th Cir. 2022) ("To succeed on his false arrest claim under Illinois law, Gaddis must show 1) arrest or restraint against his will; 2) caused or procured by the defendants; and 3) made without probable cause or reasonable grounds to believe he committed the offense"); *Duffy v. Haberkorn*, 2012 IL App (1st) 110841-U, at ¶ 17 ("caused or procured" requires "that the defendant be shown to have suggested or encouraged the arrest in some way" (emphasis omitted)).

[20] See *Carey v. K-Way, Inc.*, 728 N.E.2d 743, 747 (2000) ("[E]ven if [a plaintiff] could show that the defendants were the sole source of the information relied upon by [the officer] in making the arrest, he would still have to show that [the defendant] affirmatively instigated the arrest in some way;" nevertheless, "if a defendant is the sole source of information, a lesser degree of instigation may be necessary for liability, but if the defendant is not the sole source, an actual request or command is necessary.")

The factors for and against the exercise of federal jurisdiction thus present a close call.  The Court and the parties have invested significant judicial resources in the case—the parties have been litigating since 2019 and completed extensive discovery under the supervision of the Magistrate Judge.  Furthermore, there is some obvious overlap between the claims, in particular in assessing whether Barsch acted under color of law (*i.e.*, one of the ways he could have exceeded his role as a mere private citizen filing a complaint would be to show he went above and beyond filing his complaint by encouraging his fellow officers to commit the arrest) and assessing whether Barsch "caused or participated in the arrest" under state law.  To put it differently, showing that Barsch caused the arrest is one way (though certainly not the only way) to show that he acted under color of law.  What is more, the analysis would become further enmeshed if, on appeal, the Seventh Circuit were to elect to evaluate Defendants' contention that the plaintiffs' federal and state law claims are barred by probable cause—a point that Defendants likely would raise as an alternative ground for affirmance.

In the end, the Court concludes that relinquishing jurisdiction over the state-law claim is appropriate.  Because of this Circuit's presumption for relinquishing jurisdiction, see *Al's Serv. Ctr.*, 599 F.3d at 727, and the fact that whether the Court should grant Pitts's false arrest claim as a matter of law is not "absolutely clear," see *Donald*, 982 F.3d at 461, together with the important policy conflicts his claim may raise, see *Hagan*, 867 F.3d at 830, the Court dismisses Pitts's false imprisonment claim without prejudice.  See *Harvey v. Town of Merrillville*, 649 F.3d 526, 533 (7th Cir. 2011) ("Once the district court declined to exercise supplemental jurisdiction over the claims, the proper course would have been to dismiss them without prejudice.")

### C.      City of Chicago

Finally, summary judgment is also appropriate in favor of the City of Chicago on Pitts's federal claim.  The City of Chicago's liability rises and falls with Pitts's claim against Barsch.  See 745 ILCS 10/2-109 (""A local public entity is not liable for an injury resulting from an act or omission of its employees where the employee is not liable"); *Ross v. Mauro Chev.*, 861 N.E.2d 313, 320 (Ill. App. Ct. 2006).  Because Pitts's federal-law claim against Barsch fails as a matter of law, the City of Chicago cannot be held liable to Pitts.  The City is likewise dismissed without prejudice on Pitts's false imprisonment claim.

## IV.   Conclusion

Although Barsch incorrectly suspected Pitts of stalking, leading to his unfortunate detention, federal and state law do not authorize relief from any of the named defendants.  As explained in further detail above, the undisputed facts show that Barsch was not acting under color of law, so Pitts's § 1983 claim may not proceed.  Because of the Seventh Circuit's presumption against exercising supplemental jurisdiction over the remaining state-law claim, the Court relinquishes its supplemental jurisdiction over Pitts's false arrest claim under 28 U.S.C. § 1367(c). Accordingly, the Court grants Defendants' motion for summary judgment [111] on his false arrest claim and dismisses the false imprisonment claim without prejudice.  A final judgment consistent with Federal Rule of Civil Procedure 58 will enter in favor of Defendants and against Plaintiff and this civil case will be terminated.

Dated:  August 24, 2022

_____
Robert M. Dow, Jr.
United States District Judge